Filed 7/25/13

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S080840 |
| v. | ) | |
| | ) | Los Angeles County |
| GLEN ROGERS, | ) | Super. Ct. No. BA109525 |
| | ) | |
| Defendant and Appellant. | ) | |
| | ) | |

A jury convicted defendant Glen Rogers of the first degree murder of Sandra Gallagher (Pen. Code, § 187, subd. (a)),[1] and arson of property (§ 451, subd. (d)). One special circumstance was found true; that defendant was previously convicted of first degree murder. (§ 190.2, subd. (a)(2) [prior-murder-conviction special circumstance].) Following a penalty trial, the jury returned a verdict of death. The trial court denied the automatic motion to modify the penalty verdict (§ 190.4, subd. (e)) and imposed the death sentence for the murder and a determinate term of two years for the arson conviction. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

---

[1] All further statutory references are to the Penal Code.

SEE CONCURRING OPINION

## I. FACTS

## Guilt Phase

### A. Introduction

On September 29, 1995, defendant Glen Rogers, a drifter from Ohio who had frequented McRed's bar in Van Nuys for several weeks, picked up Sandra Gallagher at the bar and strangled her to death several hours later, burning her body in the passenger compartment of her pickup truck. Defendant fled from California to Mississippi,[2] then to Bossier City, Louisiana, where, on November 2, 1995, he picked up Andy Lou Sutton at the It'll Do Lounge. Defendant spent the night with Sutton in her apartment and left the following day, telling her he had to go to Jackson, Mississippi, to retrieve a truck, but would return. Instead, defendant traveled to Tampa, Florida, where, on November 5, he picked up Tina Cribbs at the Showtown bar in Gibsonton, on the outskirts of Tampa. Defendant took Cribbs to his Tampa motel room where he stabbed her to death that same day. The following day defendant, driving Cribbs's car, returned to Sutton's apartment in Bossier City, Louisiana. The next night, on or about November 7, defendant stabbed Sutton to death in the bedroom of her apartment.

---

[2] On October 9, 1995, defendant met Linda Price in Jackson, Mississippi, and murdered her three weeks later, on October 31. The prosecution sought to admit evidence of three out-of-state murders committed by defendant in the six-week period following Gallagher's murder in Van Nuys—the murder of Price in Jackson, Mississippi, on October 31, 1995; the murder of Tina Cribbs in Tampa, Florida, on or about November 5, 1995; and the murder of Andy Lou Sutton in Bossier City, Louisiana, on November 8, 1995—to establish that Gallagher's murder was pursuant to a common design or plan and premeditated. (Evid. Code, § 1101, subd. (b).) The trial court ruled evidence of the Cribbs and Sutton murders admissible on that basis, but excluded evidence of the Price murder from the guilt phase. Evidence of that murder was, however, admitted as part of the prosecution's case in aggravation at the penalty phase. Accordingly, the facts surrounding the Price murder are only relevant to the penalty phase and will be considered below along with the other penalty phase evidence.

Defendant fled in Cribbs's car from Louisiana through Tennessee to Kentucky, where he was ultimately apprehended by Kentucky state police after a high-speed pursuit through several towns.

**B. Prosecution Evidence.**

**1. *Defendant murders Sandra Gallagher in Van Nuys.***

On September 28, 1995, Sandra Gallagher, age 33, had lunch with her husband Stephen at a restaurant in West Los Angeles. Gallagher was happy, as she had won approximately $1,200 in the state lottery. She showed her husband the lottery ticket claim form, indicating she was going to the lottery office to submit the form. Gallagher was driving a black and silver Ford F-150 pickup truck with Colorado license plates she had obtained from her recently deceased father, who lived in Colorado. Her husband testified she was wearing a pair of distinctive earrings she had purchased from a Ross department store. An employee at the California State Lottery office in Van Nuys testified Gallagher came into the office that afternoon to claim her $1,279 in prize winnings.

In September 1995, Mamdouh Saliman owned McRed's bar on Victory Boulevard in Van Nuys. McRed's was a full service bar that served all varieties of drinks. Saliman also owned CJ's, another bar on Victory Boulevard, one block west of McRed's, that only served beer and wine. Saliman went to McRed's on the afternoon of September 28. When he parked his car, he noticed a truck with Colorado license plates in the parking lot. Around 3:00 or 4:00 p.m., Gallagher walked into McRed's and said hello to Saliman, asking, "Don't you remember me?" Saliman, who remembered Gallagher because she had previously been a host at one of his other bars, replied, "I remember your face, but I don't recall your name." Gallagher told Saliman her nickname, "Sam," and he gave her a hug. Gallagher told Saliman she had won a lottery prize. When he asked where she had

been, she replied that she had moved to Colorado after she left her employment with him.

Rein Keener worked as a bartender at McRed's in September 1995. Keener arrived at work at between 5:30 and 6:00 p.m. on September 28 and noticed a truck with Colorado license plates parked in the lot. Upon entering the bar, Keener saw Gallagher standing with Saliman, who called her over and introduced her to Gallagher. Saliman told Keener that Gallagher used to live in the neighborhood and that she was a "really nice gal." He asked Keener to look after Gallagher and "steer [her] away from the loser leeches" at the bar. After Saliman left the bar, Keener ate dinner and Gallagher played pool. At one point the two began conversing and Gallagher told Keener her father had passed away and that she had just gotten back from Colorado. Gallagher also told Keener she had just won the lottery and was planning to go to Sacramento the following day to see her three sons.

At approximately 7:00 p.m. that evening, defendant arrived at McRed's. He had recently become a frequent customer of the bar, showing up two or three times a week during the latter part of September 1995. The first time defendant patronized McRed's, he approached Keener and asked for her phone number. Keener told defendant she did not go out with men she did not know. Defendant showed up at McRed's during each of Keener's shifts for the next three weeks, repeatedly asking for her phone number. During one conversation with defendant, Keener told him she was in law school and wanted to be a prosecutor. Defendant responded that he thought women made "lousy prosecutors." He produced a laminated badge and claimed he worked for the government and traveled from state to state "looking for people." Keener did not believe defendant and felt he was just trying to impress her. Defendant began buying roses for Keener from a flower lady who frequented the bar. He also tried to impress her by pulling out

4

what appeared to be "wads of hundred dollar bills" and buying drinks for everyone in the bar.

When defendant entered McRed's on the evening in question he was wearing cowboy boots, blue jeans, and a brown leather belt with "a fancy cowboy-style buckle." His bleached-blond hair was long and feathered, and he had a neatly trimmed beard and moustache. He approached Gallagher, who "brushed him off" and continued to play pool. Defendant then left the bar. Gallagher's husband testified she called him at around 8:00 or 8:30 p.m. to tell him she was at McRed's and was thinking of staying and singing with the band.

On September 28, 1995, Cristina Walker and her boyfriend, Michael Flynn, were staying at defendant's apartment at 6645 Woodman Avenue. Walker and Flynn had moved into defendant's apartment a few days earlier after he had offered to rent them his spare bedroom. September 28 was Flynn's birthday, and he, Walker and defendant had made plans to meet that evening to celebrate. Walker and Flynn drove to CJ's bar and subsequently met defendant in front of the bar. Walker was driving her car and had her two dogs with her. Defendant, Walker and Flynn stayed at CJ's for approximately one and one-half to two hours. While there, Walker had two beers and defendant and Flynn each had approximately four beers. When Walker indicated she liked "mixed drinks," defendant told her he knew a bar up the street that served cocktails. Walker told defendant she was not yet 21 years of age. Defendant told her not to worry, stating he would tell the bartender (Keener), whom he knew "real well," that she was his sister. Defendant told Walker he had spent prior weekends with Keener and was planning on spending the upcoming weekend with her. Walker drove the short distance to McRed's, where the three arrived at approximately 8:00 to 8:30 p.m. When they arrived the bar was crowded. When Keener saw defendant arrive

5

she gave him an "irritated look." Defendant told Keener that Walker was his sister and the three ordered drinks.

At some point in the evening defendant asked Keener for a ride home, stating that because he worked for the government he "couldn't get caught with a DUI." Keener declined. Shortly afterwards, defendant approached her again, "pinned" her up against the door to the storage room, and put his arm around her back, "trying to be kissy and huggy." Defendant told Keener, "I always get what I want." Keener ducked out of defendant's reach and went back to work.

Later in the evening defendant pointed to Gallagher, commenting to Walker and Flynn that he thought she was "cool" and "pretty." Defendant announced that he was going to buy Gallagher a drink and approached her table. Walker saw Gallagher look up at defendant with a "big smile" on her face. Gallagher then turned toward Walker and Flynn and invited them to join her and defendant at her table in front of the band. Gallagher introduced herself and defendant began ordering drinks for everyone at the table. Thereafter, Gallagher joined the group "off and on," playing pool and then returning to the table whenever defendant ordered more drinks.

Sometime between 10:30 and 11:00 p.m., Gallagher sat down with defendant, Walker, and Flynn, and remained with the group for the rest of the evening. Defendant had had approximately six to eight beers; Flynn approximately three to four beers. Walker was served approximately three to four mixed drinks, and Gallagher was drinking vodka and grapefruit juice. Keener testified that after three rounds, she began diluting Gallagher's drinks because she was watching out for her. Between 10:00 and 11:00 p.m., Keener "cut [Gallagher] off." Defendant and Gallagher were observed talking, dancing together, and "being playful." Keener testified that defendant tried to pull Gallagher onto his lap and tried to kiss the back of her neck, with Gallagher "playfully" resisting.

6

Keener later saw Gallagher kiss defendant on the cheek and sit on his lap. Keener put Gallagher's large black purse behind the bar for safekeeping.

Towards the end of the evening, Gallagher and Walker went to the ladies room where Gallagher told Walker, "I really like your brother," indicating defendant had asked her to go home with them. She asked Walker if that would be all right; Walker said it would be okay. At approximately 1:20 a.m., defendant, Gallagher, Walker, and Flynn left McRed's. Their plan was to return to CJ's, then go to the 7-Eleven to buy some beer, and then go to defendant's apartment.

Defendant and Gallagher left together in Gallagher's truck; Walker and Flynn drove in Walker's car. They went to CJ's, stayed a short while, then went to the 7-Eleven store. Walker pulled alongside Gallagher's truck while defendant and Flynn went inside and returned with cigarettes and beer. Walker and Flynn then drove back to defendant's apartment in Walker's car; Gallagher followed with defendant in her truck. Upon arriving, Walker was unable to find a parking space and double-parked on Woodman Avenue. Walker was not feeling well; Flynn told her he would park her car and clean it out because the dogs had made a mess, and meet her up at defendant's apartment.

Defendant and Gallagher, who were also double-parked on Woodman Avenue, stayed inside Gallagher's truck while Flynn, who saw an empty parking space across the street, attempted to make a U-turn to park Walker's car. At that point, approximately 2:00 a.m., Los Angeles Police Department Officer David Hovey saw Flynn make an illegal U-turn and detained him. The officer testified Flynn was "extremely drunk." He was arrested for driving under the influence and placed in the back of the patrol car. Flynn testified that as the police car drove off with him, he looked back towards Gallagher's truck and saw silhouettes that looked like defendant and Gallagher were arguing or fighting, with one of them holding their arms high over the other's head or neck. Flynn testified he told the

7

arresting officer that "something weird" was going on and pointed at Gallagher's truck. Officer Hovey did not recall Flynn trying to draw his attention to anything as they pulled away.

Sometime during the night, Walker awoke in her room inside defendant's apartment. She saw defendant lying on the carpet next to her, with no shirt on and his pants unbuttoned. Defendant was awake and staring at Walker. She asked defendant, "What the hell are you doing?" Defendant replied, "Where is your boyfriend?" Walker jumped up and said, "What do you mean, where is my boyfriend? What time is it?" Defendant told Walker it was 5:00 a.m. Walker ran to the window and looked for her car, which had been impounded upon Flynn's arrest.

Walker asked defendant what he was doing in her room. Defendant told her he went into her room to "check" on her, and asked again, "Where is your boyfriend?" Walker, believing Flynn had taken her car, began to shout profanities. Defendant responded, "Oh, don't worry, honey, he went to jail." Walker asked defendant what he was talking about and began to cry. Defendant told her Flynn was "a real idiot" and had made an illegal U-turn in front of a cop. He related that Flynn had been handcuffed and arrested, and her car impounded. Walker then asked defendant, "Where is that girl?," meaning Gallagher. Defendant had a "blank look on his face," and responded, "I got bigger problems than you, honey, I got bigger problems." When Walker asked what he meant, defendant repeated two or three more times, "I got bigger problems," and stated, "I am just going to have to call some people in, I am going to have to do it." Walker again asked, "What do you mean? Where is Sam? Where is that girl at?" Defendant looked at Walker and stated, "She's dead."

Walker stopped crying because defendant "had this look in his eye." Walker asked defendant, "What did she [Gallagher] do to you, what is going on?,"

8

trying to make it seem like she was "on [defendant's] side." Defendant just stared back at her. Walker tried to act normally by changing the subject and stating she was unsure how to get Flynn out of jail. Defendant put his arm around her and leaned forward to kiss her. Walker told defendant "no," saying she loved Flynn. Defendant apologized and told Walker that he loved her like a "sister." Defendant then stated he was going to try to get Flynn out of jail, and left the room.

Walker dozed off to sleep; when she awoke it was light outside. She dressed "as fast as [she] could," put leashes on her dogs, and opened the door into the living room where defendant was lying on the living room floor in his underwear, appearing to be "out cold." Walker saw Gallagher's purse, a distinctive yellow pack of cigarettes she had been smoking, and her Ford truck keys on the kitchen bar or counter. Walker took her dogs, left the apartment at approximately 8:00 a.m., ran to the 7-Eleven store and called her grandmother's house. Her mother's boyfriend, Stewart, came to the phone and Walker told him to come get her right away. He arrived within 15 minutes and Walker got into his truck with her dogs. She asked him to help get her "stuff" out of defendant's apartment, explaining that Flynn was in jail and that, "I think this guy I am staying with, he killed this girl last night."

Walker and Stewart went back to defendant's apartment. Stewart waited in the hallway while she entered the apartment. Defendant was still sleeping on the floor. Walker stated, "Glen, Glen, wake up," and touched his shoulder. Defendant "came to his feet quickly," seemed embarrassed his pants were off, and put his blue jeans on. Walker told him her grandmother was sick in the hospital and that she needed to go home immediately to babysit her sisters. She told defendant that her mother's boyfriend was outside and that she needed to get her stuff out of the apartment. Defendant told Walker she did not need to leave, as he

9

was going to Las Vegas and she could have the apartment to herself. She declined the invitation.

Stewart assisted Walker in collecting most of Flynn's and her belongings from the apartment and loading them into his truck. Because the truck was full and Walker wanted to remove all of Flynn's and her belongings from the apartment as soon as possible, she went down the street to the residence of her friend, Cindy Keller, who also had a truck. Walker explained the situation to Keller and asked her to help her move the rest of her things out of defendant's apartment right away. Walker and Keller went back to defendant's apartment and got the remainder of Walker's belongings as defendant stood in the hallway near the door watching them. At one point, when Keller was in the hallway and defendant was in the kitchen, Walker asked defendant, "What happened to that girl last night?" Defendant told Walker, "You know what, she ran off with some Mexican last night . . . some Mexican walked up and she walked away with him."

Defendant then began going through Gallagher's large black purse, removing numerous items and nonchalantly tossing them over his shoulders with both hands, which conduct made Walker even more nervous. Walker observed defendant remove a wallet and checkbook from the purse. Defendant left the room briefly; during that time Walker looked inside Gallagher's purse and also noticed Gallagher's earring on the floor.

On September 29, 1995, at approximately 6:30 a.m., Hoora Kushan, a nurse at the Laurel Wood Convalescent Hospital located at 13000 Victory Boulevard, arrived at work and drove into the hospital's rear parking lot. She observed a pickup truck parked near some trash cans in an area of the lot where no other cars were parked. The driver's side door was partially open, and she could see the arm, elbow, and part of a leg of a man who was leaning into the truck towards the passenger side, as if he was reaching for something from the dashboard. He had

10

shoulder-length "blondish" hair and was wearing blue jeans and a shirt with rolled-up or short sleeves. Kushan testified the man's hair resembled defendant's hair. Kushan parked, got out of her car, and again looked toward the pickup truck and saw the same man with long blond hair leaning towards the passenger side, but slumped over. As she looked more closely, Kushan saw smoke coming from the dashboard on the passenger side. She observed that the pickup had Colorado license plates.

Kushan went inside the hospital and asked the nurses if they knew who owned the truck. One of the nurses suggested they go back outside and get the license plate number so they could announce it on the hospital's public address system. When Kushan went back outside, she saw flames coming from the hood of the pickup. Another hospital employee tried to put out the fire using a fire extinguisher. Kushan ran back inside the hospital and asked someone to call 911.

At approximately 6:40 a.m., fire department personnel arrived and extinguished the fire. Los Angeles Fire Department arson investigator Tim Hamson arrived at the scene of the fire at approximately 7:20 a.m. Hamson was informed by firefighters at that time that there was a body in the cab of the pickup, which he confirmed. Hamson noted the truck was a 1977 Ford half-ton extended cab pickup with Colorado license plates.

Hamson smelled gasoline in the passenger compartment of the pickup. The lower extremities of the female body inside the truck were charred to the bones, but the floor carpet underneath the body was mainly intact, indicating gasoline had been poured over the body and surrounding areas of the passenger compartment and ignited. In Hamson's opinion, the fire had been intentionally set to conceal a homicide. About 7:10 a.m., Los Angeles Police Department Detective Michael Coblentz arrived at the scene. A purse containing documents and photographs, as well as a marriage certificate, was found inside a locked metal compartment in the

11

bed of the pickup. Detective Coblentz discovered that the victim in the truck was Sandra Gallagher.

On October 1, 1995, Dr. Frisby, a forensic pathologist with the Los Angeles County Coroner's Office, performed an autopsy on Gallagher's body. Dr. Frisby was supervised by Dr. James Ribe. Dr. Ribe performed most of the dissection of the neck and Dr. Frisby dissected most of the other parts of the body. Dr. Frisby prepared the autopsy report and Dr. Ribe reviewed the report. Gallagher's back was "severely charred" down to the muscle. The front portion of her body was "less charred." Gallagher's right lower leg was severely burned, down to the muscle and bone.

Drs. Frisby and Ribe concluded Gallagher died from asphyxia due to manual strangulation. This conclusion was based on the presence of red bruising or bleeding on the right and left sternohyoid muscles, a hemorrhage on the right-hand side of the lower part of the voice box and on the left side of the voice box, bruising to the thyroid gland, broken cartilage on the left side of the throat, and multiple hemorrhages inside Gallagher's tongue. Drs. Frisby and Ribe also concluded that Gallagher was already dead at the time her body was burned, as determined from the lack of carbon monoxide in her bloodstream and the absence of black material in her windpipe. The absence of any petechiae (blood spots) in Gallagher's eyes suggested there was no shifting or loosening of the position of the hand at the time of the strangulation. Dr. Ribe opined it would have taken at least one minute of "continuous compression" for the victim to die of strangulation, and that the victim would likely lose consciousness within six to 10 seconds of complete neck compression. Gallagher's killer would therefore have needed to continue to strangle her after he saw her lose consciousness in order to ensure her death. Gallagher was found to have .10 percent by volume of alcohol in her bloodstream.

12

On October 5, 1995, at 10:30 a.m., Detective Coblentz served a search warrant at defendant's apartment on Woodman Avenue. Nobody was inside the apartment, which had little furniture. A yellow metal hoop earring belonging to Gallagher was recovered from the kitchen floor. The earring was identified by Gallagher's husband as one of a set she had purchased at a Ross department store and which she was wearing when they had met for lunch the day before her murder. A yellow pack of cigarettes was also found on the kitchen counter. Both Walker and Flynn testified the pack of cigarettes looked like the type Gallagher had been smoking when they were together with her and defendant on the night of her murder.

### 2. *Defendant travels to Louisiana and meets Andy Lou Sutton.*

In early November 1995, Andy Lou Sutton was living in a one-bedroom apartment with her roommate, Theresa Whiteside, at the Port Au Prince apartment complex in Bossier City, Louisiana. Whiteside testified Sutton was a "very beautiful girl" who had red hair and an "outgoing personality."

On November 2, 1995, Whiteside and Sutton went to the It'll Do Lounge in Bossier City. While they were sitting at the bar defendant walked in. He was dressed in blue jeans, a striped dress shirt, and had long blond hair. Sutton commented to Whiteside, "I like that." Whiteside then left to go to Mr. Bill's Lounge, where she worked as a bartender. Later that evening, Sutton called Whiteside and told her she would have "someone staying over that night," and that Whiteside's pillow and blanket would be on the couch. Whiteside returned to their apartment at approximately 3:00 a.m. on November 3, 1995. At that time, Sutton introduced defendant to Whiteside.

At approximately 10:00 a.m., Whiteside, Sutton and defendant woke up, "sat around," and talked. Defendant told Whiteside and Sutton he was a truck

13

driver and drove "18 wheelers." Later that day, Sutton told Whiteside that defendant had to go to Jackson, Mississippi, to retrieve his "18 wheeler," and asked if the red pickup defendant was driving would be all right if left in the apartment complex parking lot. Whiteside told Sutton "yes." Sutton had no car; she and Whiteside subsequently drove defendant in Whiteside's car to the Greyhound bus terminal in Shreveport, Louisiana. Defendant told them he would return in several days and gave Sutton a kiss upon exiting Whiteside's car. Sutton gave defendant her telephone number and defendant asked Whiteside to "take care" of Sutton.

### 3. *Defendant travels to Florida and murders Tina Cribbs.*

On the afternoon of November 4, 1995, defendant arrived by taxi and checked into the Tampa 8 Inn on East Columbus Drive in Tampa, Florida. He rented a room for two days, indicating his name was Glen Rogers and giving a home address in Jackson, Mississippi. The clerk on duty testified defendant had long blond hair and "gorgeous blue eyes." Defendant claimed his truck had broken down and stated he was very tired and would "probably sleep the first day."

On the morning of November 5, taxi driver Donald Daughtry picked up defendant from the motel and drove him to the Showtown bar in Gibsonton, Florida, a small town on the outskirts of Tampa where a community of carnival workers spent their winter break. Defendant asked Daughtry to let him off a short distance away from the bar. Defendant entered the bar a little before 1:00 p.m. At that time Lynn Jones was working as the bartender. She testified defendant appeared tall and "good looking," with long blond hair and "beautiful blue eyes." When Jones asked defendant in local parlance if he was "with it," meaning with the carnival, defendant did not understand her question. When she explained what

14

she meant, he told Jones he "drove trucks for the carnival," and began acting "flirtatious" with her. Defendant stayed at the bar nearly five hours.

Late in the afternoon, Tina Cribbs and three female friends entered the bar. Cribbs was 34 years old, had "reddish" hair, and was driving a white Ford Festiva her mother had purchased for her earlier that year. Cribbs and her friends sat at a table together. Defendant sent over a round of drinks to the women. Although defendant had told bartender Jones his name was Glen, she overheard him tell the women that his name was "Randy." At one point defendant approached one of Cribbs's friends, Jeanie Fuller, and asked if she was married or single. When Fuller replied that she had a boyfriend, defendant stated he did not date married women or girls with boyfriends. Cribbs's three friends left the Showtown bar late in the afternoon; Cribbs remained at the bar with defendant where they talked for another hour. Cribbs was expecting her mother to meet her at the bar that evening. At approximately 6:30 p.m., Cribbs told Jones she was going to give defendant a ride and asked Jones to tell her mother she would return in 20 minutes. Cribbs and defendant were then seen leaving the bar together.

Cribbs's mother, Mary Dicke, arrived at the bar approximately 20 to 30 minutes after Cribbs had left. Jones told Dicke that her daughter had given someone a ride and would "be right back." Dicke waited another 30 to 45 minutes, then began calling Cribbs's pager at between 7:00 and 8:00 p.m. Dicke received no response and became worried. Dicke and Cribbs had a system whereby if there was an emergency she would input the number 69. Over the course of the evening, Dicke paged Cribbs with their emergency code over 30 times, getting no response. Dicke eventually returned home and called the police because she instinctively knew her daughter was "in trouble."

At approximately 9:00 p.m. that same evening, Chenden Patel, the owner of the Tampa 8 Inn, noticed defendant leaning into a small white car in front of his

15

room.  Patel walked past the room and saw defendant standing at the door with two suitcases.  A short while later, defendant came into the office and paid Patel for two additional days, extending his rent to Tuesday morning, November 7.  He asked Patel for a "Do Not Disturb" sign; she told him she did not have one. Defendant then told Patel he did not want any maid service or anyone going into his room.  The next morning, Monday, November 6, at approximately 9:00 a.m., Patel observed defendant drive away in the white car.  Later that morning she noticed a handwritten note on the door of his room that read, "Do Not Disturb."

Later that same morning, Monday, November 6, Cribbs's purse was found by an attendant on top of a trash can at a rest stop on Interstate 10, just east of Tallahassee.  At that time, unsuccessful attempts were made to call the telephone number listed on the identification in the purse.

On Tuesday, November 7, at approximately 10:00 a.m., a housekeeper found Cribbs's body in the bathtub of the motel room defendant had rented. Responding Tampa police officers found the handwritten "Do Not Disturb" sign still on the front door.  The bed was unmade and the television was on.  Blood-soaked shoes, pants, and towels were piled on the bathroom floor next to the toilet. The officers observed blood smeared on a counter and floor of the foyer, as well as on the bathroom shower stall.  Blood had also dripped down from the sink counter and bathtub and toilet fixtures.  Cribbs's body was found face-up in the bathtub with articles of clothing in between her legs.  Several cigarette butts and a small gold bracelet were found in the sink drain.

Tampa Police Homicide Detective Julie Massuchi examined Cribbs's body and noted numerous stab wounds, including a "very significant stab wound to the right buttocks area," a "large stab wound under the left breast," and smaller nicks on the chest area.  There was also a long "defensive" scratch wound on the wrist area, as well as numerous bruises to the arms and back.  A pair of black jeans and

16

a shirt with tears in them were found in the pile of blood-soaked clothing on the bathroom floor. The stab wounds on the body corresponded to the tears in the jeans and shirt. Based on this finding, Detective Massuchi believed the victim was clothed at the time she was stabbed to death. It appeared the homicide happened "some time" prior to the discovery of the body, as the body showed lividity, indicating it had been in the bathtub for some time.

On that same day, Cribbs's mother Mary Dicke was watching the news on television and learned that a "Jane Doe" had been found murdered in a motel. Dicke knew from the description of the victim that it was her daughter, and notified the police. Ernest Bruton, who had possession of Cribbs's purse found at the freeway rest stop, was also alerted to the newscast of the homicide and turned the purse over to authorities.

Following a jury trial, defendant was convicted of the first degree murder of Tina Cribbs in Florida on May 7, 1997.

### 4. *Defendant returns to Louisiana and murders Andy Lou Sutton.*

On Wednesday morning, November 8, 1995, Theresa Whiteside woke up and Andy Sutton told her defendant had returned to Bossier City and was outside in the parking lot cleaning up a car he had purchased for her. A neighbor, Sterling Fontenont, testified he saw defendant walking back and forth between a white Ford Festiva and a red truck that morning. Defendant entered the women's apartment and, when Whiteside asked what kind of car he had purchased for Sutton, he replied "some kind of Ford," "some '90 model," stating he had paid a friend $8,400 for it. Whiteside made arrangements to meet defendant and Sutton later that day at the It'll Do Lounge, and left the apartment.

At approximately 3:00 p.m., the three met up at the It'll Do Lounge. When Whiteside arrived, she saw defendant's red truck outside the bar. Defendant

17

approached Whiteside, put his arm around her, and told the bartender to get her "whatever [she] wanted." Whiteside, who felt uncomfortable with defendant's arm around her, extricated herself and sat down with Sutton, while defendant remained at the end of the bar. Whiteside told Sutton she did not want defendant staying at the apartment anymore and that he "needed to go." Sutton responded she would "take care of that." The three then decided to go to the Touch of Class bar.

Defendant and Sutton stopped for cigarettes and then met Whiteside at the second bar at approximately 4:00 p.m. They ordered beers. Defendant began playing with the back of Whiteside's hair. Whiteside motioned that she did not want defendant to touch her, and told him, "If you can't hang, you don't need to be hanging around us," by which she meant he should leave if he could not handle his alcohol. By then, defendant appeared drunk. Sutton asked if she could take defendant back to the apartment and let him "sleep it off." Whiteside told Sutton that would be okay, indicating she would call Sutton later. At approximately 4:30 p.m., defendant and Sutton left the bar together and Whiteside went to work.

Between 10:30 and 11:00 p.m. that night, neighbor Sterling Fontenont arrived at the apartment complex and observed defendant and Sutton park their vehicle in the lot, get out of the car, and walk together towards Sutton's apartment.

Despite defendant's earlier representation that he and Sutton would meet Whiteside at the bar where she worked later that night, they never showed up. At approximately 11:00 p.m., Whiteside called Sutton, but the phone rang unanswered 10 to 12 times and the answering machine did not pick up the call. Whiteside arrived home at between 3:00 and 3:30 a.m. on Thursday morning and noticed defendant's red truck still parked in the lot. She had to unlock the deadbolt to gain entry into her apartment; Sutton was not in the habit of using the deadbolt. As Whiteside entered the apartment, she heard another door shut. The

18

lights were on in all the rooms, but it appeared to Whiteside that no one was in the apartment. Whiteside hollered for Sutton, who did not answer. The bedroom door was shut, but the blanket and pillow had not been left out on the couch for Whiteside. She turned on the television, lay down on the couch in the living room and fell asleep.

Around 8:00 or 9:00 a.m., Whiteside awoke because the television volume had been turned up to "maximum capacity." She grabbed the remote control from the coffee table, turned off the television, and fell back to sleep. At approximately 10:00 a.m. she heard a knock on the door, got up, and let Sutton's ex-boyfriend, Thomas Bryant, into the apartment. Bryant related that he had repeatedly attempted to call the apartment, only to receive a recording that the phone was out of service. Whiteside went to the bedroom, knocked on the door, and receiving no answer, entered the room.

Sutton's bedding was "all wrapped up tightly like a present." Whiteside called out "Andy," then pulled off the bedding and found a body with a pillow over the head and so much blood around the chest area that Whiteside was unable to tell if it was a man or a woman. She pulled the pillow off the head and saw "the most horrible agonizing facial features that she had ever seen." Sutton's arm was back behind her head and there were cut marks on her right wrist. Bryant entered the bedroom and attempted to turn on the light, but found it inoperable. The telephone was on the floor with the receiver uncradled. When Whiteside tried to call 911 from the telephone in the living room, she was unable to get a dial tone.

Whiteside and Bryant ran out to the parking lot and called 911 from Bryant's cell phone. While outside, Whiteside noticed defendant's red truck was still parked in the lot. Bossier City police officers arrived and found a knife in the bedroom under a pile of clothing. The knife had been removed from a butcher block knife set in the kitchen.

19

An autopsy performed on Sutton's body revealed 14 stab wounds, including defensive wounds on her fingers and wrist, one of which had penetrated the muscles. There were stab wounds to Sutton's abdomen, upper body, back, shoulders, and torso. The cause of death was determined to be multiple stab wounds, some of which were more than six inches deep.

### 5. *Defendant's flight to Kentucky, where he is apprehended.*

A registration check on the red pickup left in Sutton's apartment complex parking lot revealed it was registered to defendant in Mississippi. A warrant was obtained for defendant's arrest and an all-points bulletin broadcast for his apprehension.

On November 13, 1995, Kentucky State Police set up surveillance on state Highway 52 in Ravenna, Kentucky, near where defendant was visiting a relative. Defendant was observed in Cribbs's white Ford Fiesta with a Tennessee license plate and the officers gave chase. Defendant, who was drinking while driving, began throwing half-full beer cans at the pursuing officers' vehicles. The high-speed pursuit continued for 50 miles, through four towns, with defendant running red lights and driving on the wrong side of the highway, until his vehicle was rammed and he was taken into custody. Numerous items recovered from Cribbs's Ford Fiesta were identified as belonging to her. Florida and Mississippi license plates were recovered from the vehicle. Additional items in the car, including a cooler packed with food, a comforter, and Social Security cards belonging to Whiteside's two sons, were identified by Whiteside as having been stolen from the apartment she shared with victim Sutton.

### C. Defense Evidence.

Defendant took the stand in his own defense. On September 28, 1995, he had been living at 6645 Woodman Avenue in Los Angeles for a period of several weeks. His girlfriend was the apartment building manager and he was the

20

maintenance man; when they broke up, he lost the job and sold his furniture. He confirmed that on September 28 he began drinking beer at CJ's at 11:00 a.m. Christina Walker and Michael Flynn were staying in his apartment. Defendant called his friend Steve Kele, met him at a bank, and received $1,000 from Kele. Defendant returned to CJ's, then went to his apartment to change clothes, then went back to CJ's and drank more beer. Walker and Flynn met him at CJ's at approximately 5:30 p.m., where they stayed and drank beer for several hours. They then drove in Walker's car the one block to McRed's, arriving at approximately 7:30 p.m.

Inside McRed's, defendant approached Gallagher, who introduced herself as "Sam," and invited the three to join her. The four sat together at a table, defendant purchasing approximately six to eight rounds of drinks for the group. Defendant and Gallagher danced, and Gallagher kissed him and sat on his lap. Defendant claimed he had been intimately involved with bartender Rein Keener during the prior few weeks, and that if she appeared irritated with him it was because she did not want to reveal her personal life while at work. He denied Keener resisted his advances at one point in the evening, and denied telling her, "I always get what I want."

Gallagher agreed to leave McRed's with defendant, Walker and Flynn, and the four left shortly before closing, at approximately 1:20 a.m. They went back to CJ's, where defendant intended to meet Steve Kele. Defendant rode in Gallagher's truck; Flynn was with Walker in her car. After having a round of drinks at CJ's, they went in both vehicles to a nearby 7-Eleven, where Flynn and defendant purchased beer. Flynn and Walker then sped off in Walker's car toward the apartment. According to defendant, Kele pulled up in his Lincoln, and he told Kele, "Follow us. We're going to the apartment." Kele agreed. As Gallagher and defendant approached defendant's apartment building in Gallagher's truck,

21

defendant saw police lights and heard sirens in front of the building. Defendant testified Gallagher told him there was a warrant out for her arrest for failing to appear in court and she did not want to be arrested or have her truck impounded. Gallagher and defendant pulled into a nearby strip mall parking lot, with Kele pulling in behind them. Defendant and Gallagher got out of the truck and spoke to Kele, then they both got into Kele's car and the three drove to defendant's building, parking in the underground garage.

According to defendant, Kele and Gallagher went up to the apartment with him. Walker was lying on her bed with her door open, so he closed the door, and Kele and Gallagher entered the apartment. The three talked, and at one point Gallagher stated she wanted to go back down to her truck to change her clothes. Kele took Gallagher back to her truck. Defendant stayed in the apartment, drank a few more beers, then passed out. After Kele left with Gallagher, defendant never saw Gallagher again.

Defendant woke up at approximately 6:00 a.m. When he awoke, neither Kele nor Gallagher were in the apartment. At approximately 6:30 a.m., he spoke with Walker. Defendant admitted telling Walker he had "bigger problems" than her problem of Flynn being arrested for drunk driving, and admitted telling her Gallagher was dead. He did not call the police because he did not know "for sure" if Gallagher was dead. Walker then "passed right back out" or fell asleep. Defendant denied that Gallagher's purse or keys were in the apartment, or that he searched her purse. Defendant left the apartment, walked to a pay phone, and called Kele. At approximately 11:00 a.m., Kele went to defendant's building and picked him up. The two then spent the day together.

Two days after the murder, defendant left on a bus for Jackson, Mississippi, where he planned to renew his truck driver's license, and then head back to his hometown of Hamilton, Ohio. He had no plans to return to California. He

22

stopped to gamble in Las Vegas, then took a bus to Jackson, Mississippi. Two weeks after arriving in Jackson, he drove his red truck to Ohio, staying in Ohio for "a week or two" and then returning to Mississippi. Defendant insisted he did not kill Gallagher. He confirmed he had been convicted of first degree murder in Florida in 1997, and of forgery in Ohio in 1987.

## Penalty Phase

### A. Prosecution Evidence.

### 1. *The Murder of Linda Price in Jackson, Mississippi.*

On October 9, 1995 [ten days after Gallagher's murder but prior to the murders of Cribbs in Florida and Sutton in Louisiana], Kathy Carroll, her husband, her son, and her younger sister, Linda Price, went to the Mississippi State Fair in Jackson, Mississippi. Price was 34 years old, and Carroll testified she "had long red hair, and she was slim. She was real pretty. She smiled all the time." They arrived at between 6:30 and 7:30 p.m., went to the beer tent, sat at a table drinking and listening to the band. An hour or two after arriving, Carroll noticed defendant standing nearby. Defendant had long blond hair and blue eyes. Carroll and her husband got up from their table and danced. When they returned, defendant was sitting at the table with Price. Price introduced defendant to Carroll and her husband. Price asked Carroll "over and over," "Ain't he real good looking?" Carroll observed defendant and Price drinking beer and dancing before she and her husband left.

Three days later, on October 12, Price called her mother, Carolyn Wingate, and asked her to come to the Sun-N-Sand Motel in downtown Jackson. When Wingate arrived, Price ran down the stairs and stated, "Mother, I have someone I want you to meet," adding, "You will just love him to death. He is precious. I found the love of my life." Defendant came down the stairs and Price introduced him to Wingate as Glen Rogers. Defendant indicated his truck had been stolen at

23

the state fair and asked Wingate if she could give them a ride to "the place where they take the stolen vehicles." Wingate, Price and defendant drove in Wingate's car to the impound lot. Defendant and Price looked around the lot and located defendant's red truck. The three went to the police station where defendant obtained a receipt to retrieve his vehicle, then returned to the impound lot and recovered the truck.

On October 16, 1995, defendant and Price rented a two-bedroom apartment in Jackson, Mississippi. Carroll visited her sister at the apartment five to six times, and on each occasion Carroll saw defendant's truck parked in the lot. Price drove defendant's truck while defendant did some work for a construction company. Price and defendant went to Wingate's house "quite often" during the following two weeks.

Wingate went to Price's apartment early on the morning of October 30. She told Price she had been contacted regarding a job Price had applied for, and that Price was to start work the next morning. Price told her mother she would stop by her house early the next morning before heading to the job. Caroll also went to Price's apartment on October 30, to tell her an appliance store had called her as a reference for Linda Price and Glen Rogers in connection with a stereo they had rented. At that time defendant stated to Carroll in "a mean way," "I'm Glen Rogers." Carroll made plans to bring her children over to Price's apartment the following evening, which was Halloween.

That same day, October 30, Price called her second older sister, Marilyn Reel, who came over with her family and "sat with her all day." At one point defendant appeared and stated to Price, "I know that was you talking because I could hear your big mouth everywhere." Price was upset by the comment and cried. Later that evening, Reel's husband asked Price if she wanted to go out with them for a few beers. Price asked defendant if he would come and he stated, "It

24

don't matter," "[w]e can go with him." The group went to the Sportsmen's Lounge on Highway 80 in Jackson. When defendant overheard Price tell her sister that she loved her, he commented to Price, "Don't be telling her that." Price replied, "Glen, I'm always telling my sister that." Price and her sister then went to the ladies room, where Price started crying. Price asked Reel to bring her children to the apartment the next evening for Halloween.

On the morning of October 31, Price did not go to her mother's house as expected. Wingate went to her daughter's apartment at approximately 9:00 a.m. At that time, Wingate did not see defendant's truck in front and no one answered when she knocked on the door. Wingate waited for Price, but Price never showed up. As it was out of character for Price not to keep an appointment, Wingate began looking for her. Later in the evening, at approximately 6:30 p.m., Carroll brought her children to Price's apartment. At that time, Carroll did not see defendant's truck. She knocked on the door but there was no answer. Carroll left the apartment and called her mother, telling Wingate she could not find Price.

The next day, November 1, Wingate returned to the apartment and looked into a window. The apartment was "dimly lit," but Wingate could see that the shower curtain in the bathroom was drawn closed around the bathtub. Wingate became more concerned, as Price was an "immaculate housekeeper" who never kept the shower curtain drawn around the tub. Wingate called the police and filed a missing person's report the following morning.

On November 3, Wingate and the police went to the apartment, were admitted by a maintenance man, and found Price dead in the bathtub. Jackson Police Detective Chuck Lee arrived and found the living room in "disarray," with cassette tapes, beer cans, and ashtrays full of cigarette butts scattered on the floor. There were blood smears on the kitchen floor and a garbage can that contained bloody paper towels. A mop on the kitchen counter had blood on the mop head.

25

Written on the bathroom mirror in red lipstick were the words, "Glen, we found you." The shower curtain was drawn closed around the bathtub. Detective Lee pulled the curtain aside and found Price in the bathtub completely nude, on her back, with a washcloth covering her face. Her body had several stab wounds, including a cut to her neck "from ear to ear" that was "completely slashed open," two stab wounds under her right breast, one stab wound above her right breast, one stab wound on her right side just below the armpit, and one stab wound to her right shoulder blade area.

When Wingate returned to her house following the funeral several days later, she received a phone call from a man who asked, "Is this Linda's mother?" When she replied, "Yes it is," the caller stated, "I'm Glen's brother. I am looking for Glen Rogers." Wingate told the caller, "We are looking for him, too." When the caller responded, "Why?," Wingate stated, "My daughter has ended up dead. I want to know where he is." The caller then commented, "I am not surprised that your daughter is dead because anybody that has been around Glen for the last seven years has ended up dead." When Wingate replied, "What? What are you doing? Why are you calling me?," the caller responded, "Your f—ing daughter is dead, isn't she?" Wingate, who had spoken with defendant "a lot of times" since meeting him several weeks earlier, then recognized the voice as his.

### 2. *Other Prior Violent Crimes Evidence.*

The People presented evidence that in March 1991, in his hometown of Hamilton, Ohio, police were summoned to defendant's house twice in one day on reports that he was "inside tearing up the house," and later, that he had a gun, had threatened a live-in girlfriend, and planned to "blow away anybody that came near his house." During the initial call, police found the interior walls of the house broken up from blows with a hammer, with defendant passed out on his bed. During the second call later that day, defendant was found to be in an

26

"uncontrollable rage" and threatened to "blow away anyone that came to the door." Residents from surrounding houses were evacuated. At one point defendant put the nozzle of a lit acetylene blow torch through a hole in the front door, within two feet of the face of an officer who was attempting to negotiate his surrender. When the door caught fire, officers entered the house and arrested defendant. He was charged with aggravated menacing inducing panic and attempted arson as a result of the incident.

In 1994, defendant and Maria Gyore were living together in Hollywood, California. On one occasion that year, when defendant learned of Gyore's former boyfriend, he beat her up, giving her a black eye and "all kinds of bruises." Defendant was arrested as a result of the incident. On another occasion, while still living with Gyore in Hollywood, defendant again beat up Gyore with his hands and fists. There was also a fire reported in the apartment that year. In 1995, defendant and Gyore moved to the Woodman Avenue apartment in Van Nuys, where Gyore became the apartment manager and defendant the "maintenance guy." In August 1995, defendant told Gyore to move out of the apartment, threatening to kill her, her brother, and her two young sons. Family members became fearful for Gyore's safety and encouraged her to leave the country. Gyore traveled to Hungary two days later.

### 3. Victim Impact Evidence.

Gallagher's mother, Jan Baxter, and a younger sister, Jeri Vallicella, testified how her murder "totally destroyed" the whole family. Gallagher was 33 years old at the time of her death. She had three sons who were seven, eight, and 15 at that time. When she was 23 years old, Gallagher had joined the Navy, scoring the highest score in Butte County on the Navy's intelligence test. She worked for the Navy as an aviation electronics technician, and after four years, left the Navy with an honorable discharge. She met her husband Stephen while both

27

were in the Navy, and they were married in 1985. Gallagher then worked at a submarine base for a military contractor, where she was in charge of all the electronics at the base. The couple then moved to San Diego, where she worked for another military contractor, Ford Aerospace, for two to three years, and then for Southern Illinois University's contracting facility at the San Diego Navy base. Gallagher's sister Jeri, who was five years younger than she, testified Gallagher had been like a "second mother" to her. Gallagher's oldest son, Dustin, was "devastated" by the loss of his mother and "closed up" emotionally after her death.

## B. Defense Evidence.

### 1. Family Background.

Defendant was one of seven children born to Edna and Claude Rogers. They lived in Hamilton Ohio, a working-class town north of Cincinnati. The father, who worked at a paper mill for 16 years, was an alcoholic who drank every day and was "rarely sober." He routinely beat his wife and children. He once threatened to kill his wife if she left him; during one beating he broke her nose and rendered her unconscious. He kept several guns in the home. He was fired from the mill for "drinking on the job."

Defendant was born shortly after his father lost his job. The family lost their home and moved to the worst part of Hamilton. The house they moved into was "rundown," with only two bedrooms and one bathroom, with peeling paint and frozen pipes in the winter. Defendant and his siblings were beaten up by other neighborhood children; their father encouraged them to fight back. There was testimony that defendant, as a young child, ate paint chips and dirt, wet his bed, and banged his head on the edge of his bed. Defendant was held back in third grade and placed in several learning disability classes.

Defendant's oldest brother, Clay, introduced him to alcohol and drugs at the age of 12. Defendant was beaten by his father more frequently than his

28

siblings because he was "a little more rebellious." When defendant was 16 years old, his father became disabled from a heart attack. The defense presented testimony from several of defendant's siblings to establish that he, like several of them, eventually grew up to become alcoholics.

### 2. *Mental Health Expert Testimony.*

The defense also presented the testimony of several mental health professionals. Dr. Roger Light, a neuropsychologist, performed a number of tests on defendant, and reviewed various educational, hospital and police reports. He concluded defendant exhibited certain areas of cortical dysfunction in his right frontal and temporal lobe areas that could account for impulsive behavior. Dr. Light, however, acknowledged that defendant's I.Q. test results were "pretty average," and that "for the most part" he performed in the average to "high average" range of functioning on the administered tests. Dr. Light also reviewed a CAT scan taken in 1991 when defendant was hospitalized after having been struck on the head with a pool cue. He concluded the scan revealed a "closed head [brain] injury" that would have made it more difficult for defendant to control his behavior, make the "right" decisions, or stop using alcohol. Dr. Michael Gold, a neurologist, performed a PET scan on defendant's brain that revealed diminished metabolic activity in areas of his frontal lobes corresponding to the injury he suffered when struck with a pool cue. Psychologist Stuart Hart, who specialized in the maltreatment and emotional abuse and neglect of children, interviewed defendant's mother and several of his siblings, but not defendant, and reviewed some of defendant's school and criminal history records. Hart concluded defendant grew up in a "toxic" or "poisonous" social environment which, combined with poverty and the lack of family values, was likely to produce a negative outcome for a child. Dr. Jeffrey Wilkins, a psychiatrist, testified that

29

defendant's "chronic alcoholism" would affect brain function over the years and correlate with an inability to control rage.

### 3. *Seeking Clergy During Flight.*

Last, there was testimony that defendant, while fleeing through Kentucky immediately following the Sutton murder, briefly stopped at the Kentucky Mountain Mission, a youth haven Bible camp. He entered the mission, asked for a chaplain, was told there was none there, and returned to his car looking "really troubled." A worker who went outside to talk to defendant reported that when she approached him he "just sort of grunted and shook his shoulders" and "gave her the creeps."

## II. Discussion

### A. Pretrial/Jury Selection Issue

#### *Excusal for cause of Prospective Juror No. 3156.*

Defendant argues that the trial court erred in granting the prosecution's challenge for cause against prospective juror No. 3156. He asserts the prospective juror's responses to the written jury questionnaire, and his follow-up responses during oral voir dire by the court, at most showed he was uninformed about the death penalty, and not that he was categorically opposed to voting for a death sentence. Defendant urges there was insufficient evidence to establish that his ability to serve as an impartial juror was substantially impaired.

"Although 'a criminal defendant has the right to an impartial jury drawn from a venire that has not been tilted in favor of capital punishment by selective prosecutorial challenges for cause,' 'the State has a strong interest in having jurors who are able to apply capital punishment within the framework state law prescribes.' (*Uttecht v. Brown* (2007) 551 U.S. 1, 9.) '[T]o balance these interests, a juror who is substantially impaired in his or her ability to impose the death penalty under the state-law framework can be excused for cause; but if the

30

juror is not substantially impaired, removal for cause is impermissible.' (*Ibid.*; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424.)" (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1328 (*McKinzie*).) " '[T]he law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment "would 'prevent or substantially impair the performance of his [or her] duties as a juror' " in accordance with the court's instructions and the juror's oath. [Citations.]' (*People v. Blair* (2005) 36 Cal.4th 686, 741.)" (*People v. Duenas* (2012) 55 Cal.4th 1, 10 (*Duenas*).)

" 'The trial court is in the best position to determine the potential juror's true state of mind because it has observed firsthand the prospective juror's demeanor and verbal responses.' (*People v. Clark* (2011) 52 Cal.4th 856, 895 (*Clark*); see *People v. Garcia* (2011) 52 Cal.4th 706 (*Garcia*), 743; see also *Uttecht, supra,* 551 U.S. at p. 9 ['Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors.'].)" (*McKinzie, supra,* 54 Cal.4th at pp. 1328-1329.) Accordingly, " '[w]hen the prospective juror's answers on voir dire are conflicting or equivocal, the trial court's findings as to the prospective juror's state of mind are binding on appellate courts if supported by substantial evidence. (*People v. Wilson* (2008) 44 Cal.4th 758, 779 (*Wilson*); see *Wainright v. Witt* (1985) 469 U.S. 412, 424 (*Witt*); accord, *People v. Lewis* (2008) 43 Cal.4th 415, 483 (*Lewis*) [trial court's determination as to prospective juror's true state of mind is binding].)" (*Duenas, supra,* 55 Cal.4th at p. 10.)

Prospective Juror No. 3156 completed the juror questionnaire distributed to potential jurors prior to oral voir dire. His written responses reflect he was 27 years old, single, resided in Los Angeles, and was employed as a concierge for the Regal Biltmore Hotel. In the section of the questionnaire entitled, "Attitudes

Toward Capital Punishment," he indicated, "I don't know what to think about capital punishment, if it is good or bad, right or wrong." He indicated he felt that way "because there has been a lot of people who received capital punishment who did not deserve [it,] and then there were others who did." He characterized the strength of his views as "like many people whom I talk with." In response to the question asking about his views on life without the possibility of parole, he stated, "Well if you do the crime you must do the time and if you are not capable to be in city life anymore I am all for it." In response to the question asking which penalty, death or life in prison without parole, was "more severe," he responded, "you lose your life either way," and then indicated he would not "always" vote for one penalty or the other in a given case. When asked if he would want to "hear and review all of the circumstances and facts of a case" before deciding the appropriate penalty, as well as "all the circumstances concerning the defendant and his background," he answered yes. When asked in what types of cases, and for which offenses, the death penalty should be imposed, he responded, "I don't know" because "I never had to make that kind of decision." In response to a question on whether the death penalty was imposed too frequently in California, he stated, "I never hear about the death penalty in California." When asked if he had any religious views on the death penalty, he responded, "I don't follow any religion." Last, he stated that if selected to be on a jury he would "just want to do what is right by law."

During oral voir dire, and after both sides had chosen and accepted the jury, Prospective Juror No. 3156 was orally voir dired as a potential alternate juror. He elaborated on his response in the questionnaire regarding people who received the death penalty who "did not deserve it," explaining that this response was based on, "[j]ust growing up and just knowing about the few people that I've known that, you know, just didn't get a fair chance." He then explained, "At this time I really

32

don't know too much about the death penalty so I'm not for it or against it.  Well, I'm not for it."  When asked by the court, "Are you against it?  Your inclination would be against it?," he responded, "Yeah.  Against it."  He agreed that if the mitigating evidence was more substantial than the aggravating evidence, it "would be easy" not to vote for death, but then suggested he could not even vote for life without parole in that situation.  When asked by the court, "Can you conceive of anything that might cause you to vote for death?," he responded, "No."  When asked, "Under any circumstances?," he responded, "Not at any."  When the court pointed out that the prospective juror's opinions seemed to have become "a lot stronger" than those he had indicated on his questionnaire, he responded that his views had changed because, "I had time to think about it, to really think about it.  It's a difference when you are talking with your friends."  He then stated, "To actually have to make that decision, I couldn't do it," further suggesting it would be "hard" to vote for death even if the defendant was "Jeffrey Dahmer or Richard Ramirez."

Prospective Juror No. 3156 then again reaffirmed that even if the aggravating factors outweighed the mitigating factors he could not vote for life without parole, explaining, "I just don't feel like I'm in the position to really make a decision on what punishment one should get for their crime."  When the court observed that earlier it thought the prospective alternate juror had just made a misstatement when indicating he could not vote for life without parole if the mitigating evidence outweighed the aggravating evidence, he responded, "I couldn't see myself voting for life or the death penalty."  When asked if it was "the penalty you don't want to deal with?," he responded, "Exactly."

Following oral voir dire, the prosecution challenged Prospective Juror No. 3156 for cause.  Defense counsel declined to "argue for him," choosing to simply submit the matter to the court.  The court found good cause to excuse the

33

prospective juror on the basis that his views had evolved from his answers to the written questionnaire to the point where it was clear he would refuse to vote for either life imprisonment without parole or the death penalty.

The record thus reveals that Prospective Juror No. 3156's answers to the written jury questionnaire and to his oral voir dire were plainly in conflict. We find substantial evidence that his expressed reticence to deliberate on penalty in a death case " ' "would 'prevent or substantially impair the performance of his . . . duties as a juror' " in accordance with the court's instructions and the juror's oath. [Citations.]' [Citation.]" (*Duenas, supra,* 55 Cal.4th at p. 10.)

### B. Guilt Phase Issues

#### 1. *Admission of evidence of Florida & Louisiana murders.*

Defendant contends the trial court improperly admitted evidence of the Florida (Cribbs) and Louisiana (Sutton) murders as probative on intent and common design or plan in the commission of Gallagher's murder. He asserts the uncharged murders were inadmissible under Evidence Code section 1101, subdivision (b) (Evidence Code section 1101(b)) because they were insufficiently similar to the charged murder, because he did not concede identity, i.e., that he murdered Gallagher, and because he did not dispute that the charged murder, viewed objectively, was premeditated, and offered to stipulate as much. He further asserts that evidence of the uncharged murders should have been excluded under Evidence Code section 352 (Evidence Code section 352) as unduly prejudicial, and that admission of such evidence violated his federal constitutional right to a fair trial. We reject each of these arguments and find the other crimes evidence properly admitted at the guilt phase.

The guiding principles are set forth in the following three paragraphs from *People v. Foster* (2010) 50 Cal.4th 1301, 1328, 1329 (*Foster*): " 'Evidence that a defendant has committed crimes other than those currently charged is not

34

admissible to prove that the defendant is a person of bad character or has a criminal disposition; but evidence of uncharged crimes is admissible to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (Evid. Code, § 1101.) Evidence of uncharged crimes is admissible to prove identity, common design or plan, or intent only if the charged and uncharged crimes are sufficiently similar to support a rational inference of identity, common design or plan, or intent. [Citation.]' (*People v. Kipp* (1998) 18 Cal.4th 349, 369.)

" 'The least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent. [Citation.] . . . In order to be admissible to prove intent, the uncharged conduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' [Citations.]" [Citation.]' (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*).) 'A greater degree of similarity is required in order to prove the existence of a common design or plan. . . . [E]vidence of uncharged misconduct must demonstrate "not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are individual manifestations." ' (*Ibid*.) 'The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove identity. . . . [T]he uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature." [Citation.]' (*Id*. at p. 403.) ' " 'The highly unusual and distinctive nature of both the charged and [uncharged] offenses virtually eliminates the possibility that anyone other than the defendant committed the

charged offense.' [Citation.]" ' (*People v. Hovarter* (2008) 44 Cal.4th 983, 1003 (*Hovarter*).)

"If evidence of prior conduct is sufficiently similar to the charged crimes to be relevant to prove the defendant's intent, common plan, or identity, the trial court then must consider whether the probative value of the evidence 'is "substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)' (*Ewoldt, supra,* 7 Cal.4th at p. 404.) 'Rulings made under [Evidence Code sections 1101 and 352, including those made at the guilt phase of a capital trial] are reviewed for an abuse of discretion. [Citation.]' (*People v. Mungia* (2008) 44 Cal.4th 1101, 1130.) 'Under the abuse of discretion standard, "a trial court's ruling will not be disturbed, and reversal . . . is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." [Citation.]' (*Hovarter, supra,* 44 Cal.4th at p. 1004.)" (*Foster, supra,* 50 Cal.4th at pp. 1328-1329.)

The prosecution argued below that there were numerous common and distinctive features between the charged murder of Gallagher and the out-of-state murders so as to warrant the latter's admissibility on the issues of intent and common design or plan.[3] These included that: (1) the victims were all women of approximately the same age (31 to 37 years old); (2) in each instance defendant went to a local bar to select his victim; (3) in each instance he sought out a woman

---

**3**     The prosecution did not seek to introduce the other crimes evidence to prove identity, i.e., that defendant was Gallagher's killer. Moreover, at defense counsel's request, the instructions given to the jury on the limited purpose for which the Florida and Louisiana murders were being admitted into evidence instructed them that such evidence was to be considered solely on the question of intent.

36

unknown to him, and unaccompanied by a man; (4) in each instance he socialized with the victim, danced and/or talked with her, and bought her drinks in an effort to gain her trust; (5) in each instance defendant then convinced the victim to give him a ride or to accompany him to his residence or lodging; (6) each murder was perpetrated in a room or small enclosed area when defendant and the victim were alone (the cab of Gallagher's pickup truck; Sutton's bedroom while roommate Whiteside was at work; defendant's Tampa motel room); (7) after each murder defendant took property from the victim, including jewelry, money, handbags, keys, and personal identification documents; (8) after each murder defendant attempted to conceal the victim's body, clean up the crime scene, or otherwise conceal evidence of the crime in order to buy himself time to escape; (9) after each murder defendant quickly left town, in each instance crossing state lines within a few days to thwart his apprehension; and (10) all of the murders were perpetrated within a short six-week period. The trial court ultimately ruled evidence of the Cribbs and Sutton murders (but not the Price murder)[4] admissible on the issue of intent, and thereafter reaffirmed that ruling in the face of continued defense objections on various grounds.

The trial court was well within its discretion in ruling that the combination of distinctive marks and similarities in all three murders was sufficient to meet the standard for admissibility of the other crimes evidence on the element of intent, i.e., whether the murder of Gallagher was premeditated and deliberate and committed with express malice. Defendant selected each of his victims in a

_____

[4]    As noted (*ante,* at p. 2, fn. 2), shortly after Gallagher's murder but before the murders of Cribbs in Florida and Sutton in Louisiana, defendant traveled to Mississippi, where he met Linda Price at a "beer tent" at the state fair. The two cohabitated in a rented apartment in Jackson, Mississippi, for approximately two weeks before Price was found murdered in the apartment. The trial court ruled evidence of the Price murder inadmissible at the guilt phase under Evidence Code section 1101(b).

37

similar manner, used a common ploy to lure them to a place where they would be alone before murdering them, then acted in similar fashion after each murder; cleaning up the murder scenes or otherwise attempting to conceal the victims' bodies to buy himself time to escape, taking personal property from each victim, and fleeing across state lines. " '[T]he recurrence of a similar result . . . tends (increasingly with each instance) to negat[e] accident or inadvertence or self-defense or good faith or other innocent mental state, and tends to establish (provisionally, at least, though not certainly) the presence of the normal, i.e., criminal, intent accompanying such an act . . . .' (2 Wigmore[, Evidence] (Chadbourn rev. ed. 1979) § 302, p. 241.)" (*People v. Ewoldt, supra,* 7 Cal.4th at p. 402 (*Ewoldt*); see also *People v. Cole* (2004) 33 Cal.4th 1158, 1194; *People v. Lewis* (2001) 25 Ca1.4th 610, 636-637; *People v. Carpenter* (1997) 15 Cal.4th 312, 379.) The Cribbs and Sutton murders were "sufficiently similar [to the Gallagher murder] to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' (*People v. Robbins* [(1988)] 45 Cal.3d 867, 879.)" (*Ewoldt*, at p. 402.)

Defendant urges that the trial court's findings of similarity between the three murders were overstated and renews his argument that the Cribbs and Sutton murders were not sufficiently similar to the charged Gallagher murder to warrant their admission below. He argues that the fact that he met his victims "in a bar" was an insufficient ground of similarity because "there was nothing distinctive about the fact that he 'talked, danced and drank' in bars with women his own age." His argument misses the mark. The "features of substantial but lesser distinctiveness may yield a distinctive combination when considered together." (*People v. Miller* (1990) 50 Cal.3d 954, 987.) Although several of the factors considered below, e.g., drinking, dancing, and socializing with persons close to one's age in bars, when viewed in isolation, may not appear particularly unusual

or distinctive, it was the *combination of similar factors* common to all three murders—defendant's socializing, drinking, or dancing with women in their 30's, unaccompanied by a male companion, in local bars; buying them rounds of drinks to gain their trust; convincing them to give him a ride, or to accompany him back to his home or lodging; killing them in a confined or secluded space (Sutton's bedroom, defendant's Tampa motel room to which Cribbs had given him a ride, and in the case of Gallagher's murder, the cab of her pickup under cover of darkness late at night); hiding the bodies (or in the case of Gallagher, burning her body) so as to avoid detection and buy further time to escape; fleeing from each crime scene with the victim's property; crossing state lines, in each instance within two days, to further facilitate his escape; and the fact that all three murders were committed within the very short time span of approximately six weeks—that rendered evidence of the out-of-state murders admissible to show that Gallagher's murder was both premeditated and deliberate and committed with express malice.

Defendant specifically challenges the trial court's finding of similarity between the charged murder of Gallagher and the murder of Andy Lou Sutton in Louisiana, arguing there was no evidence that Sutton gave him a ride home from a bar before she was murdered. But the evidence showed that on November 2, 1995, defendant initially met Sutton and her roommate Whiteside at the It'll Do Lounge in Bossier City, Louisiana, and that he spent the night with Sutton in the women's apartment. He then convinced Sutton and Whiteside to give him a ride to the Shreveport bus terminal, told them he would return in a few days, kissing Sutton and telling Whiteside to "take care" of her, traveled to Tampa, Florida, where he murdered Tina Cribbs, and then returned to Louisiana less than a week later in Cribbs's car, telling Sutton he had bought the vehicle for her. Defendant, Sutton and Whiteside again went out drinking, first to the It'll Do Lounge, then to the Touch of Class bar, and after defendant became intoxicated, Sutton obtained

39

Whiteside's permission to take defendant back to their apartment so he could "sleep it off." The evidence strongly supported the inference that defendant stayed in their apartment and murdered Sutton in her bedroom that same night, before Whiteside returned home from work at 3:00 a.m.

Thus, although there was a period of approximately one week between the time defendant first met Sutton in a bar and convinced her to let him spend the night in her apartment and the point at which he returned to Louisiana after murdering Cribbs in Florida and murdered Sutton, there was little merit to defense counsel's argument that the facts of Sutton's murder did not "fit the pattern of picking somebody up in a bar and taking somebody home and killing them."

Defendant also renews his argument that his offer to stipulate that the Gallagher murder was "a first degree or nothing type of a case" should have been accepted by the prosecutor and the trial court because the stipulation would have "eliminate[d] the need for proving intent . . . or proving premeditation and deliberation." Defense counsel represented to the court that the strategy behind his offer to so stipulate was "a way to keep . . . the Louisiana and Florida fact pattern[s] out of the guilt phase." The prosecution objected on several grounds, including that the other crimes evidence being offered under Evidence Code section 1101(b) was "much larger in a sense than just first degree murder."

The claim is without merit. Neither the prosecutor nor the trial court was legally obligated to accept defendant's proffered stipulation. Indeed, the trial court was unauthorized to enforce such a stipulation over the prosecutor's objection. A trial court cannot compel a prosecutor to accept a stipulation that would deprive the state's case of its evidentiary persuasiveness or forcefulness. (*People v. Waidla* (2000) 22 Cal.4th 690, 721, fn. 5; *People v. Sakarias* (2000) 22 Cal.4th 596, 629; *People v. Scheid* (1997) 16 Cal.4th 1, 16-17; *People v. Arias* (1996) 13 Cal.4th 96, 131; *People* v *Edelbacher* (1989) 47 Cal.3d 983, 1007.)

"[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the Government chooses to present it." (*Old Chief v. United States* (1997) 519 U.S. 172, 186-187.)

Although the circumstantial evidence that defendant premeditated Gallagher's murder with express malice was strong, the prosecution had the right to present all available evidence to meet its burden of proving the requisite mens rea for first degree murder beyond a reasonable doubt. (See *Mullaney v. Wilbur* (1975) 421 U.S. 684, 704; *People v. Rios* (2000) 23 Cal.4th 450, 462.) Although evidence was presented that Flynn saw "silhouettes" of defendant and Gallagher possibly fighting in the cab of Gallagher's pickup, with one of them holding his or her hands high above the other's head or neck, Flynn was intoxicated when he made that observation from the backseat of a patrol car after being arrested for drunk driving. Even though the autopsy evidence revealed Gallagher had been strangled to death with considerable force by an assailant who held a steady grip on her neck for at least a minute before she expired, Flynn remained the only possible eyewitness to a physical altercation that might have led to Gallagher's death. Finally, although a witness testified she saw a man with long blond hair like defendant's leaning into Gallagher's pickup and setting fire to the passenger compartment, this was not a full, positive identification of defendant. And although considerable other circumstantial evidence pointed to defendant as having killed Gallagher with premeditation and deliberation and express malice, including his repeated statement to Walker that he had "bigger problems" than she did, immediately followed by his admission of knowledge that "[Gallagher] is dead," and his callous rifling through Gallagher's purse in Walker's presence a short time later, still, it remained the prosecution's burden to prove premeditation and malice beyond a reasonable doubt (See *Mullaney v. Wilbur*, at p. 704; *People v. Rios*, at p. 462), and its right to introduce all relevant and admissible evidence

41

toward that end. As explained, evidence of the Cribbs and Sutton murders was such additional substantial evidence, admissible under Evidence Code section 1101(b) to further prove that Gallagher's murder was premeditated and deliberate and committed with express malice.

Defendant also contends that evidence of the out-of-state murders was inadmissible to prove intent because the identity of Gallagher's killer remained in dispute at the guilt phase. He relies on a civil case, *Hassoldt v. Patrick Media Group, Inc.* (2000) 84 Cal.App.4th 153, in which it was suggested that "where the identity of the actor is in dispute and the uncharged misconduct fails to satisfy the stringent 'so unusual and distinctive as to be like a signature' standard enunciated in *Ewoldt*, the uncharged conduct is not admissible on such issues as intent, motive or lack of mistake or accident . . . ." (*Id.*, at p. 166.)

We have since clarified that the passage from *Hassoldt* is an incorrect statement of the law. (*Foster, supra,* 50 Cal.4th at p. 1332 ["Defendant contends . . . the evidence could not be admitted for a purpose other than identity if the identity of the perpetrator was in dispute. We have rejected this argument."]; *People v. Soper* (2009) 45 Cal.4th 759, 778 ["There is no requirement . . . that the defendant was the perpetrator in both sets of offenses."]; see also *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1222-1227; *People v. Spector* (2011) 194 Cal.App.4th 1335, 1392.)

We further conclude the trial court did not " 'exercise[] its discretion in an arbitrary, capricious, or patently absurd manner . . . result[ing] in a manifest miscarriage of justice[]' " (*Foster, supra,* 50 Cal.4th at pp. 1328-1329) when it refused to exclude the evidence of the two out-of-state murders as unduly prejudicial under Evidence Code section 352. Defendant suggests the other crimes evidence unfairly characterized him as a "serial killer." But defendant was never labeled a "serial killer" by the prosecution. Because all other crimes evidence in a

sense may be viewed as "inherently prejudicial" (see *Ewoldt, supra,* 7 Cal.4th at p. 404), " 'uncharged offenses are admissible only if they have *substantial probative value.' "* (*Foster, supra,* 50 Cal.4th at p. 1331, quoting *People v. Thompson* (1980) 27 Cal.3d 303, 318.)  We have explained that although the other circumstantial evidence that Gallagher's murder was perpetrated with premeditation, deliberation and express malice was strong, the People were not limited to presenting such evidence to the exclusion of the material and probative other crimes evidence.  Evidence of the Florida and Louisiana murders, which shared numerous distinctive features and similarities with Gallagher's murder, and which were committed within six weeks of her murder, had substantial probative value to show that her murder was premeditated and committed with express malice.

Nor did the possibility of undue consumption of time render the uncharged murders inadmissible under Evidence Code section 352.  A trial court has discretion to exclude evidence if it concludes presentation of the evidence will "necessitate undue consumption of time." (Evid. Code, § 352.)  Here, the court did not abuse its discretion in concluding that admitting this probative evidence would not be unduly time consuming.

Moreover, the limiting instructions ultimately given to the jury, as modified at defense counsel's request, ensured that the other crimes evidence would not be considered for any improper purpose.  The jury was specifically instructed only to consider evidence of the Florida and Louisiana murders for the "limited purpose of determining if it tend[ed] to show whether defendant committed the murder [of Gallagher] with express malice aforethought and with premeditation and deliberation, and not as a result of rage or provocation or other heat of passion." In his closing argument, defense counsel emphasized that the cautionary instructions required the jurors to "follow the law and follow this instruction about

43

evidence admitted for a limited purpose and set aside the emotions and make your decision based on the facts."

Defendant also argues that admission of evidence of the Florida and Louisiana murders rendered his trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment to the United States Constituion. Not so. Because the evidence was material, probative, and admitted under Evidence Code section 1101(b) on the legitimate issue of intent, defendant's due process right to a fair trial was not transgressed by the admission of such evidence. (See *People v. Caitlin* (2001) 26 Cal.4th 81, 122-123.)

### 2. Instruction on flight (CALJIC No. 2.52)

Section 1127c provides, in relevant part, "In any criminal trial or proceeding where evidence of flight of a defendant is relied upon as tending to show guilt, the court shall instruct the jury substantially as follows: [¶] The flight of a person immediately after the commission of a crime . . . is not sufficient in itself to establish his guilt, but is a fact which, if proved, the jury may consider in deciding his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

Pursuant to this section, and without any objection by the defense,[5] the trial court instructed the jury with CALJIC No. 2.52, Flight After Crime, as follows: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt, but is a fact which, if proved, may be considered by you in the light of all other proved facts in

---

[5] Challenges to the flight instruction given pursuant to section 1127c are cognizable on appeal even in the absence of a contemporaneous objection. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1055; *People v. Visciotti* (1992) 2 Cal.4th 1, 60.)

44

deciding whether the defendant is guilty or not guilty. The weight to which this circumstance is entitled is a matter for you to decide."

Defendant challenges the facial validity of the standard flight instruction on several asserted due process grounds. He argues the instruction is "unfairly partisan and argumentative," permits the jury to draw irrational permissive inferences of guilt, and is unnecessary because it improperly duplicates the circumstantial evidence instructions. The claims that the instruction is argumentative and permits the jury to draw arbitrary and/or biased inferences from isolated items of evidence have long since been rejected and will not be reconsidered here. (See *People v. Bacigalupo* (1991) 1 Cal.4th 103, 127-128.) The instruction "properly advised the jury of inferences that could rationally be drawn from the evidence," and "[t]he jury could properly infer consciousness of guilt from defendant's efforts to leave California [citation]." (*Id.*, at p. 128.) Nor was the flight instruction duplicative of other circumstantial evidence instructions, as it served to " 'ma[ke] clear to the jury that certain types of deceptive or evasive behavior on a defendant's part could indicate consciousness of guilt, while also clarifying that such activity was not of itself sufficient to prove a defendant's guilt, and allowing the jury to determine the weight and significance assigned to such behavior.' " (*People v. Boyette* (2002) 29 Cal.4th 381, 438, quoting *People v. Jackson* (1996) 13 Cal.4th 1164, 1224.)

Defendant claims the flight instruction, as applied to him, "was not constitutional under the facts of this case" because it invited the jury to conflate evidence of his flight from the Florida and Louisiana murders with his prior flight from California after Gallagher's murder. The argument borders on the specious. The evidence ruled admissible at the guilt phase showed that defendant committed three murders in three different states over the course of six weeks. After each murder he fled with the victim's property, inferentially so after Gallagher's murder

45

because although her earring was found in defendant's apartment, her large black purse and its contents, which Walker observed defendant rifling through, was not left behind in the apartment and was never recovered. Defendant ultimately fled through two more states (Tennessee and Kentucky) until finally being apprehended after a high-speed chase through four towns that ended with police cruisers ramming his vehicle in order to force him off the road.

Moreover, defendant took the stand in his own behalf and testified that after leaving California he was traveling home to Hamilton, Ohio, but stopped off at Las Vegas, Nevada, to gamble, and then at Jackson, Mississippi, to renew his truck driver's license, before returning to Ohio. The prosecution was entitled to counter this testimony with evidence that defendant remained in continuous flight from the time he murdered Gallagher in California until he was apprehended in Kentucky approximately six weeks later.[6] The standard flight instruction given below properly left it to the jury " 'to determine the weight and significance assigned to such behavior.' " (*People v. Boyette, supra,* 29 Cal.4th at p. 438.) There was no error in so charging the jury.

### 3. *Instruction on possession of stolen property as it related to murder and arson charges (CALJIC No. 2.15)*

The jury was instructed at the guilt phase with CALJIC No. 2.15, as follows, "If you find that [defendant] was in conscious possession of recently stolen property, the fact of that possession is not by itself sufficient to permit an inference that the defendant is guilty of the crime of murder or arson. Before guilt may be inferred, there must be corroborating evidence tending to prove his guilt. However, this corroborating evidence need only be slight, and need not by itself

---

[6]    The prosecutor argued to the jury, "He's out of there immediately after killing a person. [¶] He is out of there. He's out of Florida, and he's out of Louisiana, and he's on the run, and he's just not on the run when he's arrested from Louisiana, from Florida, he's on the run from all of them."

be sufficient to warrant an inference of guilt. [¶] As corroboration, you may consider the attributes of possession—time, place and manner, that the defendant had an opportunity to commit the crime charged, the defendant's conduct, or any other evidence which tends to connect him with the crime charged."

Defendant contends that the giving of CALJIC No. 2.15, regarding inferences to be drawn from evidence of his possession of stolen property, was reversible error because it "permitted the jury to draw an irrational permissive inference that improperly lightened the state's burden of proof" and "gave the jury a fundamentally incorrect theory of culpability." Specifically, he asserts the instruction impermissibly allowed the jury to find him guilty of murder or arson "based solely on the alleged fact that he was 'in conscious possession of recently stolen property,' " subject only to the condition that there be " 'slight' " corroborating evidence of guilt. As explained below, under decisions of this court filed after defendant's trial, the giving of CALJIC No. 2.15 in this murder case was erroneous. As will further be explained, on this record the instructional error was manifestly harmless.

During the prosecutor's guilt phase closing argument, he argued that defendant could be convicted on several theories of first degree murder, including the theory that Gallagher was killed during the commission of a felony, i.e., robbery. The prosecutor specifically referenced the court's instruction with CALJIC No. 2.15, arguing there was sufficient corroborating evidence to support an inference of guilt based on defendant's possession of recently stolen property. The prosecutor emphasized that defendant was seen with Gallagher's purse in his apartment on the morning of the murder, and that Walker saw Gallagher's earring drop out of the purse. He pointed out the earring was later found in the apartment. The prosecutor argued further that Walker's testimony concerning defendant's

47

admission that he had a "bigger problem," followed by his statement to Walker that Gallagher was dead, further corroborated the inference of guilt.

Following the giving of the instruction and the prosecutor's argument, defense counsel indicated he was objecting to the instruction as "improper" on the ground that "all you need is slight corroboration to go from being in possession of some stolen property to get to murder and arson." The court indicated the instruction was applicable to evidence regarding defendant's possession of Gallagher's purse, keys, and other property, as well as his possession of property owned by Sutton's roommate Whiteside and Cribbs that was recovered upon his arrest. The court concluded the prosecution had carried its burden of proof as to those facts and that the giving of the instruction was proper.

CALJIC No. 2.15 is based on the long-standing rule allowing a jury to infer guilt of a theft-related crime from the fact that a defendant is found in possession of recently stolen property when such evidence is accompanied by slight corroboration of other inculpatory circumstances tending to show guilt. (See *People v. McFarland* (1962) 58 Cal.2d 748, 754-758.) It is a permissive, cautionary instruction "generally favorable to defendants; its purpose is to emphasize that possession of stolen property, alone, is insufficient to sustain a conviction for a theft-related crime. (*People v. Yeoman* (2003) 31 Cal.4th 93, 131; *People v. Mendoza* (2000) 24 Cal.4th 130, 176-177; *People v. Johnson* (1993) 6 Cal.4th 1, 37; cf. *People v. Najera* (2008) 43 Cal.4th 1132, 1135-1136 [defendant argued he was prejudiced because the trial court had a *duty to give* CALJIC No. 2.15 sua sponte in all theft-related cases and failed to do so].)" (*People v. Gamache* (2010) 48 Cal.4th 347, 375 (*Gamache*).)

On the other hand, in cases decided subsequent to the trial in this case, "we have . . . cautioned that the instruction is inappropriate for non-theft-related crimes, and instructing that possession of stolen property may create an inference

48

that a defendant is guilty of murder, as was done here, is error. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 101; *People v. Prieto* [(2003)] 30 Cal.4th [226] at pp. 248-249.)" (*Gamache, supra,* 48 Cal.4th at p. 375.) The People recognize as much and concede that it was error to give CALJIC No. 2.15 in this case.

As for defendant's argument that instructing the jury with CALJIC No. 2.15 "improperly lightened the state's burden of proof," "we have previously rejected it. The instruction does not establish an unconstitutional mandatory presumption in favor of guilt (*People v. Yeoman*, 31 Cal.4th at p. 131) or otherwise shift or lower the prosecution's burden of establishing guilt beyond a reasonable doubt (*People v. Parson* [(2008)] 44 Cal.4th [332] at pp. 355-356; *People v. Prieto*, *supra*, 30 Cal.4th at p. 248)." (*Gamache, supra,* 48 Cal.4th at p. 376.) Defendant offers no persuasive reason to reconsider these decisions.

Defendant argues that instructing a jury with CALJIC No. 2.15 in a non-theft case is reversible error because it results in "the prosecution present[ing] its case to the jury on alternate theories, some of which are legally correct and others legally incorrect, and the reviewing court cannot determine from the record on which theory the ensuing general verdict of guilt rested." (*People v. Green* (1980) 27 Cal.3d 1, 69.) However, "it is well established the *People v. Watson* (1956) 46 Cal.2d 818, 836, test applies. (*People v. Parson*, *supra*, 44 Cal.4th at pp. 357-358; *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 101; *People v. Prieto*, *supra*, 30 Cal.4th at p. 249.)" (*Gamache, supra,* 48 Cal.4th at p. 376.) Under that test — whether it is reasonably probable defendant would have obtained a more favorable result had the instruction not been given — the error here in extending CALJIC No. 2.15 to the murder and arson charges was clearly harmless. Gallagher was last seen alive together with defendant in her pickup truck; Flynn, although intoxicated at the time, thought he saw defendant and Gallagher in a

physical altercation inside the pickup; a short time later Walker woke up in defendant's apartment and he told her, "I got bigger problems than you, honey, I got bigger problems," and admitted knowledge that Gallagher was dead; and a short while after that a man closely resembling defendant was seen setting fire to the passenger compartment of Gallagher's pickup truck, in which her burned body was later found. Additionally, the other crimes evidence, which established by a preponderance of the evidence that defendant murdered Tina Cribbs in Florida and Andy Lou Sutton in Louisiana within six weeks of Gallagher's murder in a manner that shared many distinctive features and similarities to Gallagher's murder, and the forensic results of Gallagher's autopsy, which showed that she was forcibly strangled for a period of at least one minute until she expired, further supported an inference that Gallagher's murder was premeditated, deliberate, and committed with express malice.

### 4. *Instruction on burden of proof for out-of-state murders.* (CALJIC Nos. 2.50 & 2.50.1)

Defendant contends the other crimes evidence instructions given below require reversal because they permitted the jury to find him guilty of Gallagher's murder, and find true the prior-murder-conviction special circumstance, by a preponderance of the evidence rather than by the constitutionally compelled proof beyond a reasonable doubt standard. The claim is without merit.

After the court determined to admit the evidence of the Florida and Louisiana murders, defense counsel submitted a modified version of CALJIC No. 2.50, which read, "Evidence was introduced for the purpose of showing that [defendant] committed crimes other than that for which he is on trial. This evidence relates to two homicides alleged to have been committed by [defendant] in November of 1995 in the states of Florida and Louisiana. [¶] Except as you will otherwise be instructed, this evidence, if believed, may not be considered by

50

you to prove that the defendant is a person of bad character or that he has a disposition to commit crimes. It may be considered by you only for the limited purpose of determining if it tends to show whether [defendant] committed the murder alleged in Count 1 with express malice aforethought and with premeditation and deliberation, and not as a result of rage or provocation or other heat of passion. [¶] For the limited purpose for which you may consider such evidence, you must weigh it in the same manner as you do all other evidence in the case. [¶] You are not permitted to consider such evidence for any other purpose." The instruction was read to the jury both before presentation of the other crimes evidence and again before closing arguments and deliberations.

The jury was further instructed pursuant to former CALJIC No. 2.50.1 (6th ed. 1996), which read, "Within the meaning of the preceding instruction [CALJIC No. 2.50, as modified], the prosecution has the burden of proving by a preponderance of the evidence that the defendant committed the homicides other than that for which he is on trial. [¶] You must not consider this evidence for any purpose unless you find by a preponderance of the evidence that the defendant committed the other homicides."[7] Finally, the jury was instructed with CALJIC No. 2.50.2, which read, in relevant part, " 'Preponderance of the evidence' means evidence that has more convincing force than that opposed to it. If the evidence is so evenly balanced that you are unable to find that the evidence on either side of an issue preponderates, your finding on that issue must be against the party who had the burden of proving it."

---

[7] Subsequent to the trial in this case, CALJIC No. 2.50.1 was amended with the addition of the following language: "If you find other crime[s] were committed by a preponderance of the evidence, you are nevertheless cautioned and reminded that before a defendant can be found guilty of any crime charged [or any included crime] in this trial, the evidence as a whole must persuade you beyond a reasonable doubt that the defendant is guilty of that crime." (CALJIC No. 2.50.1 (7th ed. 2005).)

51

It is well settled that evidence of other crimes presented in the guilt phase of a criminal trial may be proved by a preponderance of the evidence. (*People v. Medina* (1995) 11 Cal.4th 694, 763 (*Medina*); *People v. McClellan* (1969) 71 Cal.2d 793, 804.) "Prior cases explain that the facts tending to prove the defendant's other crimes for purposes of establishing his criminal knowledge or intent are deemed mere 'evidentiary facts' that need not be proved beyond a reasonable doubt as long as the jury is convinced, beyond a reasonable doubt, of the truth of the 'ultimate fact' of the defendant's knowledge or intent. (*People v. Lisenba* [(1939)] 14 Cal.2d [403] at pp. 430-431, and cases cited.)" (*Medina,* at p. 763.)

The jury below was fully instructed on the burden of proof required to convict defendant of Gallagher's murder, arson, and to find true the prior-murder-conviction special-circumstance allegation. They were charged with the standard instruction on the presumption of innocence and the prosecution's burden to prove defendant's guilt beyond a reasonable doubt. (CALJIC Nos. 2.90, 2.91.) They were instructed on the requisite elements of murder and arson. (CALJIC Nos. 8.10, 8.11, 8.20, 14.80.) They were instructed that the prosecution had the burden of proving the prior-murder-conviction special circumstance true beyond a reasonable doubt. (CALJIC No. 8.80.1.) They were specifically instructed that "each fact which is essential to complete a set of circumstances necessary to establish the defendant's guilt must be proved beyond a reasonable doubt. In other words, before an inference essential to establish guilt may be found to have been proved beyond a reasonable doubt, each fact or circumstance on which the inference necessarily rests must be proved beyond a reasonable doubt." (CALJIC No. 2.01.) And they were further admonished, "Do not single out any particular sentence or any individual point or instruction and ignore the others. Consider the instructions as a whole, and each in light of all the others." (CALJIC No. 1.01.)

52

This court has expressly approved of former CALJIC No. 2.50.1 insofar as it informed juries that other crimes evidence may be proved by a preponderance of the evidence. (See *People v. Carpenter*, *supra*, 15 Cal.4th at p. 383; *Medina, supra,* 11 Cal.4th at pp. 763-764.) Those decisions further specifically recognize that the People's burden to prove a criminal defendant's guilt beyond a reasonable doubt is not diminished by such an instruction where it is given in conjunction with CALJIC Nos. 2.90 (presumption of innocence, reasonable doubt, prosecution's burden of proof) and 2.01 (each fact essential to complete a set of circumstances necessary to establish guilt must be proved beyond a reasonable doubt). (*Carpenter, supra,* 15 Cal.4th at p. 383; *Medina, supra,* 11 Cal.4th at pp. 763-764; see also *Estelle v. McGuire* (1991) 502 U.S. 62, 72-73.)[8]

### 5. *Failure to give a unanimity instruction on theory of first degree murder.*

Defendant next argues the trial court erred in failing to instruct the jury that "if it found the [charged Gallagher] murder was of the first degree, it had to agree unanimously on the type of first degree murder." He acknowledges the many decisions of this court rejecting the claim and urges us to reconsider them, but provides no good reason to do so. We decline the invitation to do so. "[A]s long as each juror is convinced beyond a reasonable doubt that defendant is guilty of murder as that offense is defined by statute, it need not decide unanimously by which theory he is guilty." (*People v. Santamaria* (1994) 8 Cal.4th 903, 918; see

---

[8]   Defendant's reliance on *Gibson v. Ortiz* (9th Cir. 2004) 387 F.3d 812) is misplaced. That case involved the giving of former CALJIC No. 2.50.01, an instruction specifically tailored to prior sexual offenses, along with a modified version of CALJIC No. 2.50.1, which instructions together permitted the jury to "infer that the defendant committed the charged crime if it found 'that the defendant committed a prior sexual offense.' " (*Gibson*, at p. 822.) The facts and particular instructions at issue in that case are therefore inapposite to those in issue here.

*People v. Morgan* (2007) 42 Cal.4th 593, 616-617; quoting *People v. Nakahara* (2003) 30 Cal.4th 705, 712 [" 'jurors need not unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. [Citations.]' "])  The trial court was under no obligation to give a unanimity instruction in this murder case.**9**

### 6. Instruction on "anti-jury nullification" (CALJIC No. 17.41.1).

The jurors in this case were instructed at the guilt phase with the so-called "anti-jury nullification" instruction (see CALJIC No. 17.41.1 (1998 new) (6th ed. 1996)), which advised them that, "The integrity of a trial requires that jurors, at all times during their deliberations, conduct themselves as required by these instructions.  Accordingly, should it occur that any juror refuses to deliberate or expresses an intention to disregard the law or to decide the case based on penalty or punishment, or any other improper basis, it is the obligation of the other jurors to immediately advise the Court of the situation."

Defendant contends that "[t]he instruction . . . assures the jurors that their words might be used against them and that candor in the jury room could be punished.  The instruction therefore chills speech and free discourse in a forum where 'free and uninhibited discourse' is most needed. [Citation.]  The instruction virtually assures 'the destruction of all frankness and freedom of discussion' in the jury room.  [Citation.]  Accordingly, the instruction improperly inhibits the free expression and interaction among the jurors which is so important to the deliberative process.  [Citation.]"

As defendant acknowledges, although this court, in *People v. Engelman* (2002) 28 Cal.4th 436 (*Engelman*), out of "caution" disapproved the giving of

---

**9**     Defendant's jurors were instructed that if they agreed defendant was guilty of murder, they must unanimously agree whether the murder was first or second degree.  (See CALJIC No. 8.71.)

54

CALJIC No. 17.41.1 in future criminal trials in California (*Engelman,* at p. 440), we nonetheless concluded "the instruction does not infringe upon [a] defendant's federal or state constitutional right to trial by jury or his [or her] state constitutional right to a unanimous verdict" (*id.* at pp. 439-440; see also *People v. Barnwell* (2007) 42 Cal.4th 1038, 1055). We explained that the instruction properly informed the jury it had a duty to follow the court's instructions, and that "[a] juror who actually refuses to deliberate is subject to discharge by the court (*People v. Cleveland* [(2001)] 25 Cal.4th [466] at p. 484), as is a juror who proposes to reach a verdict without respect to the law or the evidence. (*People v. Williams* [(2001)] 25 Cal.4th [441] at p. 463.)" (*Engelman, supra,* 28 Cal.4th at p. 442.) We observed that where CALJIC No. 17.41.1 is given together with CALJIC Nos. 17.40 (" 'The People and the defendant are entitled to the individual opinion of each juror. [¶] Each of you must decide the case for yourself . . . .' ") and 17.50 ("instructing that in order to reach a verdict, 'all twelve jurors must agree to the decision' "), the jury is "fully informed . . . of its duty to reach a unanimous verdict based upon the independent and impartial decision of each juror." (*Engelman, supra,* 28 Cal.4th at p. 444.)[10] And we explained that the instruction "is not directed at a deadlocked jury" (*Engelman*, at p. 444) nor does it encourage "jurors who find themselves in the minority, as deliberations progress, [to] join the majority without reaching an independent judgment." (*Ibid.*)[11]

---

[10]    Both CALJIC Nos. 17.40 and 17.50 were given below.

[11]    In *Engelman*, we disapproved giving CALJIC No. 17.41.1 in future criminal trials because "[t]here is risk that the instruction will be misunderstood or that it will be used by one juror as a tool for browbeating other jurors." (*Engelman, supra,* 28 Cal.4th at p. 445.)

### C. Special Circumstance

*Challenges to the prior-murder-conviction special circumstance.*

The single special circumstance found true in this case was that "[t]he defendant was convicted previously of murder in the first or second degree." (§ 190.2, subd. (a)(2).)  The allegation was based on defendant's capital conviction in Florida, on May 7, 1997, of the murder of Tina Cribbs on or about November 7, 1995.  Defendant murdered Cribbs in Florida approximately five weeks after he murdered Sandra Gallagher in California.  Defendant's Florida conviction was not yet final on appeal at the time his capital trial for the murder of Gallagher commenced in California.

Defendant contends the prior-murder-conviction special circumstance was invalid on two grounds:  (1) the Cribbs murder in Florida was committed after the murder of Gallagher in California, and (2) the Florida conviction was not yet final when alleged as a prior-murder-conviction special circumstance in this case.  He argues the invalid special-circumstance finding violated his Eighth Amendment right to be free from an arbitrary and capricious death sentence.  (See *Spaziano v. Florida* (1984) 468 U.S. 447, 460, fn. 20.)  Respondent asserts that defendant forfeited or waived the claim on appeal by failing to raise these two specific legal challenges to the special circumstance allegation in the trial court, and by rejecting the prosecution's offer to continue the trial until the Florida murder conviction was final on appeal if he would waive time.  Respondent further contends both legal challenges to the special circumstance finding are unsupported at law.  We agree with respondent that the claims are devoid of legal merit.

#### 1. Procedural Background

Prior to commencement of trial, defendant filed a motion to strike the prior-murder-conviction special-circumstance allegation.  The motion did not expressly

allege the two legal grounds now urged on appeal as invalidating the special circumstance. Instead, defendant argued the Florida conviction was invalid due to "numerous errors of federal constitutional dimension" as outlined in defendant's opening brief filed by his attorneys in the Florida capital appeal, a copy of which was appended to defense counsel's two-page motion to strike.

A full hearing was conducted on the motion with defendant present.[12] Defense counsel argued the merits of several federal constitutional claims raised in the opening brief in the Cribbs murder appeal, urging they required that the special circumstance allegation based on that Florida conviction be stricken.[13] The prosecutor refuted the merits of each claim in the Florida brief relied on by defendant as a ground for striking the special circumstance allegation. The prosecutor nonetheless offered to continue the trial until the Florida high court decided the merits of the Florida appeal if defendant would waive his right to a speedy trial in this proceeding. The trial court properly refused to predict how the Florida Supreme Court might rule on the issues before it in the Florida appeal.

---

[12] " '[W]hen a defendant seeks to collaterally attack the validity of a prior conviction underlying a prior-murder special circumstance, he must first allege facts *sufficient to justify a hearing on his motion to strike the special circumstance*—i.e., "allege actual denial of his constitutional rights." (*People v. Sumstine* [(1984)] 36 Cal.3d [909,] 922.) The court shall *thereupon* conduct an evidentiary hearing in the manner set forth in *Coffey* and *Sumstine*.' (*Curl v. Superior Court* [(1990)] 51 Cal.3d [1292,] 1306, italics added; see *People v. Coffey* [(1967)] 67 Cal.2d [204,] 215 ['the issue must be raised by means of allegations which, if true, would render the prior conviction devoid of constitutional support.'].)" (*People v. Homick* (2012) 55 Cal.4th 816, 892-893.)

[13] In particular, defense counsel argued at some length regarding a claim in the Florida brief alleging that Florida prosecutors had repeated the same improper closing argument to a number of juries in Florida capital cases, including the penalty phase of defendant's capital trial. As argued by the prosecutor, however, this claim, even if meritorious, at most would have invalidated the Florida penalty determination and would not have invalidated defendant's underlying *conviction* of the Cribbs murder.

Addressing defendant directly, the court stated, "At this point, Mr. Rogers, you have the option of keeping the jurors from hearing about it [the Florida conviction] by waiving [your right to a speedy trial]. That's your call." Defendant nodded, signaling to the court that he understood his choice. The prosecutor's offer to continue the trial if defendant would waive time was declined by the defense. The court went on to deny the motion to strike the special circumstance allegation.

### 2. Discussion

Both grounds asserted on appeal in support of this claim present pure questions of law. Respondent urges us to find that defendant forfeited or waived each ground now asserted as invalidating the special circumstance. We do not find forfeiture or waiver of the claim. Although defendant did not specifically argue, either in his written motion to strike the special circumstance allegation or at the hearing on the motion, that a prior murder conviction must be final on appeal before it can support a prior-murder-conviction special circumstance, the gist of his argument conveyed that position insofar as he sought to convince the court that reversal of the Florida conviction for any of the federal constitutional errors alleged in the opening brief would necessarily invalidate the prior-murder-conviction special-circumstance finding. Fundamentally, had the Florida Supreme Court subsequently reversed defendant's conviction of the Cribbs murder for federal constitutional error, such would have undermined the validity of this prior-murder-conviction special-circumstance finding regardless of defendant's refusal to waive time below or specifically argue these two grounds in support of his motion to strike the special circumstance allegation. (See *Johnson v. Mississippi* (1988) 486 U.S. 578, 584-586 [holding it would violate the Eighth Amendment to allow "petitioner's death sentence to stand although based in part on a reversed conviction."].)

58

In any case, neither ground now urged in support of invalidation of the special circumstance finding has legal merit. With regard to the first ground—the fact that the murder of Cribbs in Florida was committed after the murder of Gallagher in California—numerous decisions of this court have concluded the controlling factor under the express language of section 190.2(a)(2) is whether "[t]he defendant was *convicted previously* of murder in the first or second degree" (§ 190.2, subd. (a)(2), italics added.) The "order of the commission of the homicides is immaterial." (*People v. Hendricks* (1987) 43 Cal.3d 584, 596 (*Hendricks*); see also *People v. Hinton* (2006) 37 Cal.4th 839, 879; *People v. Gurule* (2002) 28 Cal.4th 557, 636; *People v. McLain* (1988) 46 Cal.3d 97, 107-108; *People v. Grant* (1988) 45 Cal.3d 829, 848.)

As explained in *Hendricks, supra,* 43 Cal.3d 584, "Penal Code section 190.2, subdivision (a)(2) (hereafter section 190.2(a)(2)) defines the relevant special circumstance as, 'the defendant was previously convicted of murder in the first or second degree.' The language of the provision is clear: on its face, it refers simply and unequivocally to previous convictions. Moreover . . . section 190.2(a)(2) refers to convictions in prior proceedings, in contrast to subdivision (a)(3) of the same section, which defines another special circumstance as, 'The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree.' Far from superfluous, the word 'previously' is thus essential to a harmonious reading of these two subdivisions of section 190.2.

"The function of section 190.2(a)(2) is also clear—to circumscribe, as the Eighth Amendment requires (*Zant* v. *Stephens* (1983) 462 U.S. 862, 878), the classes of persons who may properly be subject to the death penalty. Defendant misconstrues the purpose of the provision, which he inaptly analogizes to statutes aimed at the habitual criminal. [Citations.] Unlike recidivism statutes, however,

59

section 190.2(a)(2) is directed neither to deterring misconduct nor to fostering rehabilitation.

"The unambiguous language and purpose of section 190.2(a)(2) thus require that a person such as defendant, already convicted of murder in a prior proceeding, must be considered eligible for the death penalty if convicted of first degree murder in a subsequent trial.  The order of the commission of the homicides is immaterial."  (*Hendricks, supra,* 43 Cal.3d at pp. 595-596, fn. omitted.)

Indeed, defendant acknowledges these settled authorities and has conceded in his opening brief that "[s]ection 190.2, subdivision (a)(2), as interpreted by this Court, applies even when the murder resulting in the previous conviction was committed *after* the charged murder.  (*People v. Hendricks, supra,* 43 Cal.3d at pp. 595-596.)"  He states further, "As [this] Court has ruled, the 'convicted previously' phrase simply requires that the conviction be rendered before the trial on the charged murder.  (*Ibid.*)  Thus, the prior-murder-conviction special circumstance premises death-eligibility on a fact that arises after commission of the charged murder for which the State seeks to execute the defendant.  This Court has rejected both state law and federal constitutional challenges to the subdivision (a)(2) special circumstance.  (*People v. Hinton* [*, supra,*] 37 Cal.4th 839, 879; *People v. Gurule* [*, supra,*] 28 Cal.4th 555, 634-638; *People v. McLain* [*, supra,*] 46 Cal.3d 97, 107-108; *People v. Grant* [*, supra,*] 45 Cal.3d 829, 848.)  Although [defendant] disagrees with the Court's construction of the 'convicted previously' language of the special circumstance, there is no point in seeking reconsideration of a ruling the Court has repeatedly reaffirmed.  Instead, [defendant] asserts his federal constitutional claims in order to preserve them for federal habeas corpus review in the event he does not obtain an order for a new trial in this Court."

Regarding finality of the prior murder conviction, respondent points to the absence of any express language in section 190.2, subdivision (a)(2) ascribing a "finality of judgment" requirement to the term "convicted" as used in the section. Respondent also argues that "a plain reading of the statute . . . does not support such an interpretation, as the subsection immediately following section 190.2(a)(2) permits . . . a special circumstance allegation if '[t]he defendant, in this proceeding, has been convicted of more than one offense of murder in the first or second degree.' (See Pen. Code, § 190.2, subd. (a)(3).) As 'convictions' arising from the same proceeding would be appealed at the same time, Penal Code section 190.2, subdivision (a)(3) would have no force or application if the statute were interpreted to require finality in the sense of exhaustion of appellate remedies."

Additionally, respondent points out that in the criminal law context, relevant California decisional law generally treats the term "conviction" as the entry of a verdict rather than a final judgment: "Thus, in *People v. Castello* (1998) 65 Cal.App.4th 1242, the appellate court found that 'the ordinary legal meaning of "conviction" is a verdict of guilty or the confession of the defendant in open court, and not the sentence or judgment' (*id.* at p. 1253), and that the term 'conviction is used throughout the Penal Code to indicate the jury verdict' (*id.* at p. 1254). Similarly, in *People v. Martinez* [(1998)] 62 Cal.App.4th [1454] at pp. 1460-1463, it was concluded that the word 'conviction' as used in the Evidence Code referred to an adjudication of guilt for impeachment purposes. (*People v. Martinez, supra,* 62 Cal.App.4th at pp. 1460-1463.) Indeed, this Court adopted the narrower definition of the term for purposes of the Three Strikes Law. (*People v. Rosbury* (1997) 15 Cal.4th 206, 210; see also *People v. Laino* (2004) 32 Cal.4th 878, 898.) In *People v. Banks* (1959) 53 Cal.2d 370, this Court also held that for the purpose of determining if the defendant had acquired the status of a person convicted of a felony, one is 'convicted' when a verdict is entered. (*Id.* at p. 391.)"

Defendant acknowleges this court has never ruled that a prior murder conviction alleged under section 190.2, subdivision (a)(2) must be "final," i.e., affirmed on appeal or no longer subject to appeal. There is good reason for that. The statute refers to "convicted previously," not convicted previously and final on appeal. (*Ibid*.) "When the language of a statute is clear, we need go no further." (*People v. Flores* (2003) 30 Cal.4th 1059, 1063.) Even criminal convictions final on appeal remain subject to being overturned many years later in habeas corpus proceedings. If the Legislature (or electorate) had intended an additional requirement of finality on appeal, or finality after exhaustion of all avenues of habeas corpus relief, it could have easily said so. It did not. The plain language of the statute must control.

We further take judicial notice of the subsequent decision of the Florida Supreme Court in *Rogers v. State of Florida* (2001) 783 So.2d 980, in which the Florida high court rejected all claims in defendant's appeal and affirmed his convictions of the first degree murder of Tina Cribbs, armed robbery, and grand theft of a motor vehicle, as well as the judgment of death imposed in that proceeding.

### D. Penalty Phase Issues

### 1. *Exclusion of "negative victim impact evidence."*

At the penalty phase, the prosecution introduced victim impact evidence regarding Sandra Gallagher, including testimony from her mother and younger sister, Jeri Vallicella, establishing that she had three sons, ages 7, 8, and 15 years old at that time of her death; that she had worked for the Navy as an aviation electronics technician and received an honorable discharge; that she thereafter worked at a submarine base for a military contractor where she was in charge of all the electronics at the base; that she subsequently held jobs with two military

62

contractors (Ford Aerospace and Southern Illinois University's contracting facility at the San Diego Navy base); that she was like a "second mother" to Vallicella; and that her murder "totally destroyed" the whole family and "devastated" her oldest son.

Defendant argues the trial court improperly thwarted his efforts to introduce " 'negative victim impact' evidence" about Gallagher "to counter the 'false impression' " created by the People's victim impact evidence, including evidence of Gallagher's alleged involvement with a motorcycle gang; her prior convictions and/or arrests for drunk driving; the alleged circumstance that she was on felony probation for possession of a firearm at the time of her murder; evidence that she was a "less-than-perfect mother and spouse"; and evidence that she once came to work with "black eyes after 'moonlighting at a biker bar.' "

"[A] defendant's Sixth Amendment right to present a defense includes the right not to have the trial court interfere with a defendant's ability to receive a fair trial. The Eighth and Fourteenth Amendments require the jury in a capital case to hear any relevant mitigating evidence that the defendant offers, including ' "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." ' ([*People v.*] *Frye* [(1998)] 18 Cal.4th [894] at p. 1015.) In turn, the court does have the authority to exclude, as irrelevant, evidence that does not bear on the defendant's character, record, or circumstances of the offense. (*Ibid.*) '[T]he concept of relevance as it pertains to mitigation evidence is no different from the definition of relevance as the term is understood generally.' (*Id.* at pp. 1015-1016.) Indeed, 'excluding defense evidence on a minor or subsidiary point does not impair an accused's due process right to present a defense.' (*People v. Fudge* (1994) 7 Cal.4th 1075, 1103 (*Fudge*).)" (*People v. Ramos* (2004) 34 Cal.4th 494, 528 (*Ramos*).)

We first consider the "negative victim impact evidence" the jury *was* permitted to consider at the penalty phase of defendant's trial. Evidence presented to the jury separate and apart from the excluded evidence gave them an accurate picture of Gallagher, her relationship to her husband Stephen Gallagher and her three children (who were not fathered by him), and the fact that she frequented bars and drank alcohol to excess. For example, the jury learned from the testimony of Gallagher's sister that "sometimes [Gallagher and her husband] would have problems." The jury learned from the guilt phase testimony of the owner of McRed's bar that Gallagher had worked for him in one of his bars in the past. The jury knew from the testimony of McRed's bartender Rein Keener that at one point during the evening of her murder Gallagher was "cut off" from being served additional alcoholic beverages. The jury knew from the forensic expert testimony that Gallagher was found to have a .10 percent blood-alcohol level in her bloodstream as measured shortly after her death. As suggested to defense counsel by the trial court at the side bar, "The jury already knows she drinks. The jury already knows she goes to bars. The jury already knows she is apparently playing around on her husband and he is playing around on her. There's no goody two-shoes portrait here."

Additionally, the jury learned from the testimony of sister Jeri Vallicella that Gallagher had been hospitalized for psychiatric problems for a short period of time sometime during the year prior to her murder. Vallicella also testified that once Gallagher had come to her home to pick up a camping trailer the Vallicellas had borrowed from her, and on that occasion she was accompanied by men with a pickup truck who indicated they belonged to the Devil's Disciples, a motorcycle riding group the members of whom Vallicella characterized as "wannabes."

The defense also presented the testimony of Sidney Klessinger, the Assistant Coordinator for Southern Illinois University at the North Island, San

64

Diego Naval Station. Klessinger was Gallagher's supervisor in 1989 when she worked at the facility, six years prior to her murder. The defense was permitted to elicit testimony from Klessinger that Gallagher was terminated from her employment after six months, prior to the expiration of her probationary period, on grounds that she dressed inappropriately in the office, used foul language, was tardy, exhibited inappropriate displays of affection, argued with her boss, and made computing errors. As part of Gallagher's responsibilities on that job, she was charged with handling the billing of student accounts. Klessinger testified Gallagher made "multiple errors" costing "over a hundred thousand dollars," requiring the paperwork to be redone and resulting in the late payment of tuition to the school.

Against this backdrop of both positive and negative evidence admitted at the penalty phase to characterize the murder victim, we find no abuse of discretion and no violation of defendant's constitutional rights in the trial court's determination to exclude certain additional evidence, related to the matters outlined above, as collateral, of marginal probative value, and unduly inflammatory under Evidence Code section 352. Of course, since Gallagher was deceased, her credibility was not at issue. Although defense counsel wanted to ask Klessinger if Gallagher had duplicated "score sheets from pool games at . . . biker bars" during work hours, the trial court did not abuse its discretion in excluding such evidence under Evidence Code section 352 as cumulative to Vallicella's testimony that she had once seen her sister in the company of members of a motorcycle group, as well as cumulative to guilt phase testimony that Gallagher played pool while at McRed's, and to Klessinger's penalty phase testimony regarding her questionable performance while employed with Southern Illinois University.

65

Similarly, the trial court did not abuse its discretion under Evidence Code section 352 in excluding evidence that Gallagher had at some point in her past been arrested and convicted of misdemeanor drunk driving, which was cumulative to evidence already before the jury that she could drink to excess, or that a gun was found in her possession on that occasion, which led to a probationary term and apparently a subsequent probation violation, which evidence was inflammatory and bore no direct relevance to the circumstances of the offense or the defendant's character and record (see § 190.3; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4-8; *Eddings v. Oklahoma* (1982) 455 U.S. 104, 112-166; *Ramos, supra,* 34 Cal.4th at p. 528), and which further bore no relevance to the testimony of her family members regarding their devastating loss of their loved one.

Finally, assuming defendant's right to present relevant mitigating evidence included the "negative victim impact evidence" excluded below, we conclude there is no reasonable possibility the penalty verdict would have been different had defendant presented the additional evidence. (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 961.)  The jury convicted defendant of Gallagher's murder beyond a reasonable doubt at the guilt phase.  His Florida conviction of Cribbs's murder was also proved to the jury beyond a reasonable doubt.  Additionally, evidence of his murder of Andy Lou Sutton in Louisiana and Linda Price in Mississippi was before the jury at the penalty phase, as was evidence of his prior acts of violence toward a former girlfriend that prompted her to leave the country in fear. Moreover, defense counsel was given considerable leeway to refute the positive victim impact evidence regarding Gallagher's career and family life through vigorous cross-examination of witnesses before the trial court ruled that any further such evidence would be excluded as unduly inflammatory, cumulative or irrelevant to the circumstances of the offense or defendant's character and record.

(§ 190.3.)  There is no reasonable possibility that presentation of additional evidence in that same vein would have resulted in a different penalty verdict.

### 2. *Refusal to instruct on lingering doubt.*

Defendant contends that the trial court erred in refusing to give the jury a requested instruction on "lingering doubt" at the penalty phase.  There was no error.  "Such an instruction is not required by the federal Constitution.  (*Franklin v. Lynaugh* (1988) 487 U.S. 164, 174.)  '[W]e repeatedly have held that although it is proper for the jury to consider lingering doubt, there is no requirement that the court specifically instruct the jury that it may do so.  [Citations.]'  (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1219.)"  (*People v. Thomas* (2012) 53 Cal.4th 771, 826 (*Thomas*).)

The trial court did instruct the jury that in making its penalty determination, it could consider "[t]he circumstances of the crime of which defendant was convicted in the present proceeding and the existence of any special circumstance found to be true," as well as "[a]ny other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence less than death, whether or not related to the offense for which he is on trial."  (CALJIC No. 8.85.)  "These instructions sufficiently encompassed the concept of 'lingering doubt,' and the trial court was under no duty to give a more specific instruction.  [Citations.]"  (*People v. Hines* (1997) 15 Cal.4th 997, 1068.)

Last, defense counsel was permitted to argue lingering doubt in his closing argument to the jury, and he did so, informing the jurors they could consider any lingering doubt on the question whether death was the appropriate penalty in this case.  (See *People v. Hines, supra,* 15 Cal.4th at p. 1068.)

67

### 3. *Constitutional challenges to death penalty statute.*

Defendant contends that numerous features of California's death penalty law, alone or in combination with each other, violate the federal Constitution because the category of offenders who are eligible for the death penalty is impermissibly broad and because there are insufficient safeguards in the penalty phase process to ensure a reliable outcome. As he acknowledges, this court has previously rejected each of his contentions.

In particular, he contends section 190.3, factor (a), and the jury instructions pertaining to that factor, are unconstitutionally vague and overbroad. He additionally urges the following subclaims with regard to the death penalty statute and accompanying instructions: (1) the penalty phase instructions are unconstitutional in that they failed to assign to the State the burden of proving beyond a reasonable doubt the existence of an aggravating factor; (2) the State was required to bear some burden of proof at the penalty phase, and if not, then the jury should have been instructed there was no such burden; (3) the instructions failed to required juror unanimity as to the aggravating factors and "unadjudicated criminal activity"; (4) the instructions were impermissibly broad by providing that the aggravating circumstances must be "so substantial" in comparison with the mitigating factors; (5) the instructions failed to inform the jurors that the central determination is whether death is the appropriate punishment; (6) the instructions failed to inform the jury that if they determined that mitigation outweighed aggravation they were required to return a sentence of life without the possibility of parole; (7) the instructions failed to inform the jury that even if they determined aggravation outweighed mitigation, they could still return a sentence of life without the possibility of parole; (8) the instructions failed to inform the jury regarding the standard of proof and lack of need for unanimity as to mitigating

68

circumstances; and (9) the instructions failed to inform the jury on the presumption of life.

Defendant further contends that the federal Constitution requires the jury to make written findings regarding the aggravating factors; that the instructions on mitigating and aggravating factors were unconstitutional because they used "restrictive adjectives in the list of potential mitigating factors," failed to delete inapplicable sentencing factors, and failed to inform the jury that "statutory mitigating factors were relevant solely as potential mitigators"; that the absence of intercase proportionality review from California's death penalty law violates the Eighth and Fourteenth Amendment right to be protected from the arbitrary and capricious imposition of the death penalty; and that California's death penalty law violates the Equal Protection Clause of the federal Constitution because noncapital defendants are afforded more procedural safeguards than are capital defendants.

Each of the foregoing claims has been repeatedly rejected by this court. (See, e.g., *Thomas, supra,* 53 Cal.4th at pp. 835-836, and citations therein to decisions rejecting each specified claim on their merits.) Defendant offers no sound reasons for this court to reconsider those decisions here.

Defendant also urges that California's death penalty statute violates international law and norms of decency. That claim too has been repeatedly rejected by this court. (*Thomas, supra,* 53 Cal.4th at p. 837; *People v. Jennings* (2010) 50 Cal.4th 616, 690; *People v. Brown* (2004) 33 Cal.4th 82, 403-404.)

### 4. Cumulative prejudice.

We have found one instance of instructional error at the guilt phase, the giving of CALJIC No. 2.15 on possession of stolen property as it related to the murder and arson charges, but found the error harmless. We have found no penalty phase errors. Accordingly, contrary to defendant's final argument, we

69

have no occasion here to make an assessment of the cumulative impact of multiple guilt and/or penalty phase errors on the penalty determination reached in this case.

### III. Conclusion

The judgment is affirmed.

**BAXTER, J.**


WE CONCUR:

CANTIL-SAKAUYE, C. J.
KENNARD, J.
WERDEGAR, J.
CHIN, J.
CORRIGAN, J.
LIU, J.

**CONCURRING OPINION BY CHIN, J.**


I agree entirely with the majority opinion, which I have signed. I write separately only to comment on defendant's argument that the trial court erred in admitting, at the guilt phase, evidence of two uncharged murders. (See maj. opn., *ante*, at pp. 34-44.) In my view, admitting evidence of only two uncharged murders, and only for a limited purpose, was unnecessarily *favorable* to defendant.

The evidence presented at the guilt and penalty phases shows that defendant committed four murders in four different states over a six-week period: the charged murder in California and later uncharged murders in Mississippi, Florida, and Louisiana. But the trial court admitted at the guilt phase evidence of only two of the uncharged murders — those committed in Florida and Louisiana. Evidence of the Mississippi murder was not presented until the penalty phase. Moreover, the court instructed the guilt phase jury it could consider the two uncharged murders solely on the question of intent. (Maj. opn., *ante*, at pp. 2, fn. 2, 36, fn. 3, 37 & fn. 4.)

The trial court had discretion, however, to admit evidence of all three uncharged murders on the question of defendant's identity as the killer.

The following facts alone provide a compelling inference that defendant committed all four murders: Within a six week period four women in four different states on four different occasions were murdered shortly after they met defendant, previously a stranger to them, in a bar and socialized with him; and

1

defendant suddenly disappeared from the area at precisely the time each murder occurred.  (As the majority opinion explains (maj. opn., *ante*, at pp. 36-38), there were yet other similarities among the murders.)  I can conceive of only two possible scenarios consistent with defendant's *not* being the killer under these circumstances, both unreasonable:  (1) Another person, who left behind no evidence of his or her existence, followed defendant from state to state and murdered the women with whom defendant began to socialize at just the time he chose to leave the area; or (2) it is sheer coincidence that each of the four women was murdered by someone else shortly after defendant began socializing with them, and that defendant happened to disappear at precisely the time of each murder.  *Perhaps* one might accept as coincidence two murders in two different states under these circumstances.  But when the third and then the fourth murders are added, coincidence cannot be a reasonable explanation.

The compelling — and entirely legitimate — inference from these facts is that defendant committed all four murders, including the charged California murder.  The evidence " 'virtually eliminates the possibility that anyone other than the defendant committed the charged offense.' " (*People v. Gray* (2005) 37 Cal.4th 168, 203.)  These similarities "lead[] to the reasonable inference that defendant was the person who committed all three [here, four] crimes." (*People v. Medina* (1995) 11 Cal.4th 694, 748.)

Because the trial court had discretion to admit evidence of all three uncharged murders for all purposes, including identity, it certainly did not err to defendant's prejudice by admitting evidence of only two of those murders for limited purposes.  Accordingly, I agree with the court's rejection of defendant's arguments to the contrary.

CHIN, J.

2

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Rogers

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S080840
**Date Filed:** July 25, 2013

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Jacqueline A. Connor

_____

**Counsel:**

William Hassler, under appointment by the Supreme Court;  and Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, for Defendant and Appellant.

Edmund G. Brown, Jr., and Kamala D. Harris, Attorneys General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, G. Tracey Letteau and Keith H. Borjon, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

William Hassler
P.O. Box 2708
Mckinleyville, CA  95519
(7070) 362-1485

Keith H. Borjon
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2366